STATE of Minnesota, et al.,
Respondents,

v.

Euclid BERTHIAUME, et al., Appellants.

No. 47249.

Supreme Court of Minnesota.

Nov. 4, 1977.

---

■■■■■■■■■■■■■■

Cloutier, Musech, Diker, Berde & Corwin, and Gregg M. Corwin, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., Robert C. Carlson and J. D. Prince, Special Asst. Attys. Gen., St. Paul, for respondents.

Heard before TODD, YETKA and KNUTSON, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

This case raises the question of whether the state, as a party to a collective bargaining agreement with a public sector employees' union, must accept as binding an award of an arbitrator that a state employee classified as a monthly laborer without civil service tenure was discharged without just cause. Only the issue of arbitrability is before us. We hold that under the provisions of the collective bargaining agreement between the union and the state, the arbitrator did not exceed his powers in reaching the merits of the dispute over the employee's discharge and accordingly reverse the decision of the district court vacating the arbitrator's award.

The employee, Euclid Berthiaume, was seasonally employed during the years 1970 to 1975 as a monthly laborer by the Department of Natural Resources at the division of forestry headquarters known as the Cloquet Station. Prior to his discharge, he was a member of the Minnesota State Employees Union, AFSCME, Council No. 6, AFL–CIO (union) and of a "bargaining unit" for which the union was its exclusive representative. Typically, the employee was hired in April of each year and was terminated the following January, a period of continuous monthly employment of approximately 9 months each year. Although his employment record shows a pattern of steady reemployment each year, it is undisputed that the employee did not acquire tenure rights as a classified civil service laborer since he never worked the required "ten months within a 12 month period."[1] His most recent period of employment began on April 21, 1975, and would have terminated in mid-January 1976 had he not been discharged on September 12, 1975, for allegedly stealing 10 gallons of gasoline from his employer's work station.[2]

At the time of the employee's discharge, the union was the exclusive representative of some 14,000 state employees who were members of various "bargaining units" and was a party to the first collective bargaining agreement with the state authorized by the Public Employment Labor Relations Act of 1971 (PELRA), Minn.St. 179.61 to 179.77. In essence, this act authorizes the union to enter into collective bargaining agreements with public employers, including the state, concerning the terms and conditions of employment. Included in the 1975 collective bargaining agreement between the union and the state were provisions governing the discipline and discharge

---

1. Minn.St. 43.09, subd. 7, provides: "Employees in the labor service who are employed for a total of ten months within a 12 month period shall receive the same civil service status given by this chapter to other classified employees of the state not in the labor service.

    "Employees in the labor service entitled to tenure rights under this subdivision shall be known as classified civil service laborers."

    To the same effect, see Minn. Rule Persl. 9(a)(2), which provides in part: "Employees in the labor service who have been employed for a total of ten months in a period of twelve consecutive months shall be known as classified civil service laborers and shall receive the same tenure rights and benefits given other classified employees of the state not in the labor service."

2. With respect to the merits of the discharge, the arbitrator found that the employee had illegally fueled his private automobile with approximately 10 gallons of gasoline from the Cloquet Station pump to drive to and from his worksite, about 140 miles distant, unaware that he was entitled to reimbursement at the rate of 16 cents a mile. The day after this incident, the employee contacted his immediate supervisor, who had been absent the previous day, and explained his reason for appropriating the gasoline. The arbitrator found that under these circumstances the employee's termination was excessive disciplinary action and ordered that he be reinstated, recover lost wages, and receive a written reprimand from his employer specifying the reasons for such action.

of employees [3] and, as mandated by § 179.-70, subd. 1, of PELRA, an established procedure for "compulsory binding arbitration of grievances.[4]

3. Article XVI of the collective bargaining agreement provides so far as pertinent: "Section 1. DISCIPLINE. *Disciplinary action may be imposed upon an employee only for just cause. Any disciplinary action imposed upon an employee may be processed as a grievance through the regular grievance procedure.* * *

* * * * * *

"Disciplinary action or measures shall include only the following:
1. Oral reprimand
2. Written reprimand
3. Suspension
4. Demotion
5. Discharge

"When any disciplinary action more severe than an oral reprimand is intended, the Appointing Authority shall, before or at the time such action is taken, notify the employee in writing of the specific reason(s) for such action.

"Section 2. DISCHARGE OF PERMANENT EMPLOYEES. The Appointing Authority shall not discharge any permanent employee without just cause. If, in any case, the Appointing Authority feels there is just cause for discharge, the employee will be suspended for five (5) days and the employee and the Local Union will be notified, in writing, that the employee is subject to discharge and shall be furnished with the reasons therefore.

"Section 3. RIGHT TO GRIEVE. The Union shall have the right to take up a suspension and/or discharge as a grievance at the third step of the grievance procedure and the matter shall be handled in accordance with this procedure through the arbitration step if deemed necessary.

"Section 4. PROBATIONARY EMPLOYEES. The Appointing Authority shall not dismiss or fail to certify a probationary employee without just cause. If the Appointing Authority feels there is just cause to dismiss or fail to certify an employee serving a probationary period, the employee will be notified in writing, with a copy to the Union, of the reason(s) for dismissal or non-certification. The Union shall have the right to process the action of the Appointing Authority as a grievance through Step 3 of the Grievance Procedure. Grievances regarding the dismissal of an employee serving an initial probationary period or regarding non-certification of an employee with permanent status in another classification are not subject to the arbitration provisions of Article XVII, (SETTLEMENT OF DISPUTES)." (Italics supplied.)

4. Article XVII of the agreement provides in pertinent part: "Section 1. GRIEVANCE PROCEDURE. *A grievance is defined as a dispute or disagreement as to the interpretation or application of any term or terms of this Agreement.* Employees are encouraged to attempt to resolve the occurrence of any grievance on an informal basis with the employee's immediate supervisor at the earliest opportunity. If the matter is not resolved by informal discussion, it shall be settled in accordance with the following procedure. *Under no circumstances may an employee who has elected to use the appeals procedure available to him/her under Minnesota Statutes 43.24, Subdivision 2, use the grievance procedure of this Agreement as outlined below for the same dispute:*

"Step 1: The Union Steward, with or without the employee, shall attempt to resolve the matter with the employee's immediate supervisor within twenty-one (21) calendar days after the employee, through the use of reasonable diligence, should have had knowledge of the first occurrence of the event giving rise to the grievance. The supervisor shall then attempt to resolve the matter and shall respond to the Steward within seven (7) calendar days.

"Step 2: If the grievance has not been resolved to the satisfaction of the Local Union within seven (7) calendar days after the immediate supervisor's response is due, it may be presented in writing by the Union Steward to the next level of supervision who has been designated by the Appointing Authority to process grievances. The written grievances shall state the nature of the grievance, the facts upon which it is based, the provision(s) of the Agreement allegedly violated, and the relief requested. The designated Employer Representative shall arrange a meeting with the Union Steward to discuss the grievance within five (5) calendar days. The Local Union President and/or Chief Steward may also participate in such meeting. A written response shall be forwarded to the Union Steward within seven (7) calendar days of the meeting.

"Step 3: If the grievance still remains unresolved, it may be presented to the Appointing Authority or designated representative by the Chief Steward within seven (7) calendar days after the Step 2 response is due. The Appointing Authority or designee shall arrange a meeting with the Chief Steward within five (5) calendar days. The Union Steward, Local Union President, and a Union staff representative may participate in such meeting. The Appointing Authority or designee shall respond to the Chief Steward in writing within seven (7) calendar days.

"Step 4: If the grievance is still unresolved after the response provided in Step 4 is due, the Union may within ten (10) calendar days serve notice of intent to submit the issue to arbitration by giving written notice to the Appointing Authority.

"The arbitration proceeding shall be conducted by an arbitrator to be selected by mutual agreement of the Appointing Authority and the Union within seven (7) calendar days after the

As the collective bargaining agreement expressly permitted, the union disputed the merits of the employee's discharge through the first three steps of the sequential grievance procedure specified by Art. XVII, § 1.[5] When the union failed to obtain a reversal of the employee's termination through these methods, it demanded binding arbitration as authorized by Art. XVII, § 1, Step 4, of the collective bargaining agreement. The state vigorously insisted that the employee, who was classified as a monthly laborer without tenure, was not entitled to binding arbitration since Art. XVI, § 4, of the collective bargaining agreement arguably limited this procedure to "permanent" employees. Reserving the right to seek judicial review in the event of an adverse decision, the state nevertheless acceded to the union's demand for an arbitrator's resolution of both the issues of arbitrability and the merits of the employee's discharge. The arbitrator adopted the union's argument on arbitrability by determining that the employee satisfied one or more of the various criteria for "permanent employee" status and as such had a contractual right to arbitrate the merits of his discharge. Thereafter, pursuant to

Minn.St. 572.23, the state moved the district court to vacate the arbitrator's award on the ground that he had "exceeded [his] powers" and that "[t]here was no arbitration agreement." Minn.St. 572.19, subd. 1(3, 5). The district court, presumably adopting the state's contention that the merits of the employee's discharge were not arbitrable because he was not a "permanent" employee, vacated the award. This appeal by the union follows.

As we view the issue of arbitrability presented, two critical questions arise:

(1) May a court vacate an arbitrator's award under a public sector collective bargaining agreement upon a determination that the arbitrator exceeded his powers in interpreting and applying the terms of the agreement?

(2) Did the collective bargaining agreement empower the arbitrator to arbitrate the merits of the employee's discharge?

■ 1. While labor disputes affecting private sector employees have historically been resolved by arbitration, at one time we expressed the view that the legislature did not intend arbitration to be available for use in the resolution of public sector em-

---

request for such action. If the parties fail to mutually agree upon an arbitrator within the said seven (7) calendar day period, either party may request the Bureau of Mediation Services to provide a panel of five (5) arbitrators. Both the Appointing Authority and the Union shall have the right to strike two (2) names from the panel. The Union shall strike the first name, the State Negotiator shall then strike one (1) name, and the process will be repeated and the remaining person shall be the arbitrator. Expenses for the arbitrator's services and the proceedings shall be borne equally by the Appointing Authority and the Union, however, each party shall be responsible for compensating its own representatives and witnesses. If either party cancels an arbitration hearing or asks for a last minute postponement that leads to the arbitrator's making a charge, the cancelling party or the party asking for the postponement shall pay this charge. The decision of the arbitrator shall be final and binding upon the parties and the arbitrator shall be requested to issue his/her decision within thirty (30) calendar days after the conclusion of testimony and argument. If either party desires a verbatim record of the arbitration proceeding, it may cause such a record to be made, providing it pays for the record and makes a copy available

without charge to the other party and the arbitrator.

"Section 2. ARBITRATOR'S AUTHORITY. The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the provisions of this Agreement. He/She shall consider and decide only the specific issue or issues submitted to him/her in writing by the parties to this Agreement, and shall have no authority to make a decision on any matter not so submitted to him/her. *The arbitrator shall be without power to make decisions contrary to, inconsistent with, or modifying or varying in any way the application of laws, rules, or regulations having the force and effect of law. The decision shall be based solely upon the arbitrator's interpretation and application of the expressed terms of this Agreement and to the facts of the grievance presented.*" (Italics supplied.)

5. As Art. XVII, § 1, provides, a discharged employee covered by the agreement has the option of proceeding under the civil service appeals procedure of Minn.St. 43.24. This offered no remedy to the employee since he had no tenure rights as a "classified civil service laborer." See, footnote 1, *supra*.

ployee grievances. See, *In re Discharge of Johnson*, 288 Minn. 300, 180 N.W.2d 184 (1970). However, since the enactment of PELRA, it is clear, and the parties agree, that public sector employees may submit grievances to arbitration, for Minn.St. 179.-70, subd. 1, specifically requires that "[a]ll contracts shall include a grievance procedure which shall provide compulsory binding arbitration of grievances." It is also clear, and we hold, that the Uniform Arbitration Act, Minn.St. c. 572, governs the authority and procedure for judicial interference with the arbitration process under either a private sector or public sector collective bargaining agreement containing an arbitration clause between "employers and employees or between their respective representatives unless otherwise provided in the agreement." Minn.St. 572.08. Although the uniform act is not expressly made applicable in PELRA, we find no statute expressing any contrary legislative intent.

■ 2. Where the issue of arbitrability is raised, the uniform act authorizes a party to the agreement to seek judicial relief either in proceedings to compel or stay arbitration under § 572.09, or after an arbitration award, in proceedings to vacate the award under § 572.19, subd. 1(3), on the ground that the "arbitrators exceeded their powers."

■ Traditionally, we have liberally interpreted and applied the uniform act, recognizing that its basic intent is—

" * * * to discourage litigation and to foster speedy, informal, and relatively inexpensive procedures for the voluntary resolution of disputes in a forum created, controlled, and administered by the written arbitration agreement." *Dunshee v. State Farm Mutual Auto. Ins. Co.*, 303 Minn. 473, 481, 228 N.W.2d 567, 572 (1975).

See, also, *Layne-Minnesota Co. v. Regents of the University*, 266 Minn. 284, 123 N.W.2d 371 (1963). Consistent with this underlying policy and purpose, we have steadfastly held that the issue of arbitrability, when raised in judicial proceedings to compel or stay arbitrability, is to be determined by ascertaining the intention of the parties from the language of the arbitration agreement itself. Where the intention of the parties as to whether the dispute is arbitrable is reasonably debatable, the arbitrator should resolve the issue in the first instance subject to the right of a party to challenge the arbitrator's resolution in proceedings to vacate the award. *Layne-Minnesota Co. v. Regents of the University*, supra. Additional support for our belief that the "reasonably debatable" standard is consistent with the tenor of the uniform act is the expectation that where the arbitrator finds that the dispute is not arbitrable, or the converse, but decides the merits to the satisfaction of the objecting party, the result will be accepted without resort to the courts.

■ 3–4. Until this appeal, we have not been called upon to resolve the issue of arbitrability in judicial proceedings to vacate an award on the ground that the arbitrator exceeded his powers in deciding the merits of the dispute.[6] Where the issue is raised in proceedings to compel or stay arbitration, § 572.09 necessarily requires an initial independent judicial resolution of the issue. Where arbitrability is raised in proceedings to vacate an award on a claim that the arbitrator exceeded his authority, the same independent judicial resolution should occur. This is not to say that the court could not be aided by the arbitrator's determination of the issue; however, the proceeding is de novo, evidence in addition to that presented to the arbitrator may be received, and the objecting party has the burden of proving the invalidity of the award. It logically follows that the uniform act does not contemplate that the court be bound by the arbitrator's determination of the issue.[7] Moreover, the arbitra-

---

6. Cf. *Metropolitan Waste Control Comm. v. City of Minnetonka*, Minn., 242 N.W.2d 830 (1976); *Internat. Union of E. & M. Workers v. Portec, Inc.*, 303 Minn. 341, 228 N.W.2d 239 (1975).

7. *Fazio v. Employers' Lia. Assur. Corp.*, 347 Mass. 254, 197 N.E.2d 598 (1964); Cf. *Grudem Brothers Co. v. Great Western Piping Corp.*, 297 Minn. 313, 213 N.W.2d 920 (1973).

tor's decision on the merits of the dispute is irrelevant to the issue of arbitrability and must be disregarded. For, unlike the issue of arbitrability, with respect to the issue of the merits of the dispute it is well settled that "an arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact, including the interpretation of the terms of any contract." *Cournoyer v. American Television & Radio Co.*, 249 Minn. 577, 580, 83 N.W.2d 409, 411 (1957); *Fischer v. Guaranteed Concrete Co.*, 276 Minn. 510, 151 N.W.2d 266 (1967); 2 Dunnell, Dig. (3 ed.) § 488. Section 572.19, subd. 1, provides an express standard for judicial interference, for it requires the following:

"  *   *   *   [T]he court shall vacate an award where:

\*      \*      \*      \*      \*      \*

"(3) The arbitrators exceeded their powers."

We therefore hold, in furtherance of the policy and purpose of the uniform act, that only when it is established that an arbitrator has clearly exceeded his powers under the agreement to submit a dispute to arbitration must a court vacate an award.

▮ 5. In the case presented, the state's motion to vacate the arbitration award was submitted to the trial court upon a stipulation detailing only undisputed facts and the contentions of the parties. No oral testimony relevant to the intention of the parties to the collective bargaining agreement was submitted. However, the state in support of its contention submitted two affidavits by the state labor negotiator asserting that the "subject of having to show 'just cause' to dismiss monthly laborers was never discussed" during the negotiations for the collective bargaining agreement and that the state did not intend to grant such "form of job protection to monthly laborers." The trial court, however, made no findings of fact as to the intention of the parties or findings in support of the labor negotiator's conclusionary assertion, instead basing its

decision, so far as we can ascertain, upon an acceptance of the state's contention that the merits of the discharge were not arbitrable because the language of the collective bargaining agreement limited Step 4 binding arbitration only to "permanent" employees, and the employee was not so classified under relevant civil service statutes and rules.[8] Upon this record and our interpretation of the provisions of the collective bargaining agreement, however, we are persuaded that the state has failed to establish that the arbitrator clearly exceeded his powers and therefore the merits of the discharge of the employee was arbitrable. As noted in footnote 3, *supra*, the contractual provisions governing "discipline and discharge" of an employee are contained in Art. XVI. Section 1 provides that disciplinary action shall include only oral or written reprimands, suspension, demotion, and discharge. Any such disciplinary action "may be imposed upon an employee only for just cause." When any disciplinary action is imposed, the agreement expressly grants any employee the right to process a grievance "through the regular grievance procedure." Thus, protection against any disciplinary action without just cause and the right to process a discharge grievance culminating in binding arbitration, by the clear language quoted above, appears to be granted to all employees covered by the agreement. Peculiarly, however, the right to process a grievance through binding arbitration is thereafter expressly reasserted as to "permanent" employees and expressly limited short of binding arbitration to "probationary" employees. The terms "permanent" and "probationary" are nowhere defined in the agreement, although Art. XII, § 4, sets forth specific probationary periods to be served "whenever an employee enters a position in the classified service." These provisions conform to the historical civil service provision granting tenure rights to persons holding permanent positions in the classified civil service of the state and withholding such rights to per-

---

**8.** Where the trial court does not resolve the fact issues in dispute, our review on appeal requires us to determine whether the trial court properly interpreted the language used by parties to the agreement. *Employers Liability Assurance Corp. v. Morse*, 261 Minn. 259, 111 N.W.2d 620 (1961).

sons during their probationary periods.[9] Unlike these historical civil service provisions, the collective bargaining agreement affords to all employees covered by the agreement, including those in the unclassified service without civil service tenure, protection from disciplinary sanctions without "just cause." Moreover, the agreement contains no express provision similar to the provision concerning "probationary" employees, which limits an unclassified labor service employee from processing a dispute concerning any disciplinary action, including discharge without just cause, through the binding arbitration procedure under Art. XVII. The implication of this recital can be either, as the state claims, that no agreement was reached by the parties as to the problem presented in this case or that the general provisions of Art. XVI, § 1, granting any employee the right to process such a dispute "as a grievance through the regular grievance procedure" of Art. XVII were subject to interpretation and application on a case-by-case basis in the arbitrable forum. Although the choice of implications is perplexing, the well-established legislative policy of favoring arbitration as a means of resolving labor disputes, unmistakably reaffirmed by § 179.70, subd. 1, of PELRA, strongly favors the conclusion that the parties agreed to resolve all disputes concerning disciplinary action by resort to the mandatory binding arbitration procedure of Art. XVII, except those disputes or grievances expressly limited. This conclusion seems almost inescapable since PELRA intended that all collective bargaining agreements provide for "compulsory binding arbitration of grievances." In fulfillment of that mandate, the agreement provided a sequential four-step procedure culminating in binding arbitration. It is clear that if the employee in this case were a permanent classified employee the merits of his discharge would be arbitrable. It is equally clear that if he were a probationary employee the merits of his discharge could be processed through only the first three steps of the grievance procedure and could not be submitted to binding arbitration. Since admittedly he is neither a permanent nor a probationary employee, the language of the agreement, buttressed by the legislative intent with respect to mandatory binding arbitration of grievances, supports our conclusion that monthly laborers were afforded protection against discharge without just cause during the term of employment by the agreement unless such rights are contrary to the statutes or rules and regulations having the force and effect of law.

We are unpersuaded that the arbitrator's decision to reach the merits violated any civil service statutes contained in Minn.St. c. 43 or the various administrative rules promulgated thereunder by the Department of Personnel. Section 43.09, subd. 7, giving tenure rights to labor service employees employed continuously 10 months out of 12, is an affirmative grant of tenure rights and could not support a negative inference in the face of the language of the collective bargaining agreement that an employee employed for the period he was in this case could be arbitrarily discharged without any cause whatsoever.

In the absence of a more explicit statutory limitation empowering an appointing authority to discharge an unclassified laborer without assigning any cause whatsoever, we hold that the union and employee in this case had a contractual right to pursue binding arbitration of the merits of the employee's discharge, and the arbitrator therefore did not clearly exceed his powers under the collective bargaining agreement.

Reversed.

OTIS, J., took no part in the consideration or decision of this case.

---

**9.** Minn.St. 43.09, subd. 1, divides state employees into the unclassified and classified service, and subd. 7 thereof makes 10 out of 12 months' labor service a classified service.