STATE of Minnesota, OFFICE OF THE
STATE AUDITOR, petitioner,
Appellant,

v.

MINNESOTA ASSOCIATION OF
PROFESSIONAL EMPLOYEES,
Respondent.

No. C9–92–990.

Supreme Court of Minnesota.

Aug. 20, 1993.

Hubert H. Humphrey, III, Atty. Gen., Catherine M. Keane, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Gregg M. Corwin, Karin Peterson, St. Louis Park, for respondent.

William F. Garber, St. Louis Park, for amica curiae, Minnesota Federation of Teachers.

Harley M. Ogata, Christina L. Clark, Roger L. Barrett, Rebecca Hamblin, Minnesota Educ. Ass'n, St. Paul, for amica curiae, MN Educ. Assc., MN Community College Faculty Assoc., State Residential Schools Educ. Assoc. and University Educ. Ass'n.

Ronald L. Rollins, Carolyn J. Trevis, Jean E. Boos, Minneapolis, for amica curiae Minnesota State Employees Union AFSCME Council 6, AFL–CIO; Middle Management Assoc.; Minnesota Government Engineer's Council, Inter–Faculty Organization; Minnesota Law Enforcement Ass'n and Law Enforcement Labor Services, Inc.

KEITH, Chief Justice.

In this case, we are asked to decide whether to recognize a public policy exception in Minnesota which would justify overturning an arbitrator's award if that award violates a well-defined and dominant public policy of the state.

This case arose out of a grievance filed by the Minnesota Association of Professional Employees (MAPE) on behalf of Mark C. Beer ("Beer"), a local government auditor who had been discharged by the state auditor on April 15, 1991, for falsifying expense reports and for being untruthful during an investigation into that misconduct. Beer worked in the state auditor's office as a local government auditor from July 29, 1987, until his discharge on April 15, 1991.

On Friday, January 4, 1991, a meeting was held between the newly-elected state auditor, Mark Dayton, and two local government auditors, Jeff Wiita and Beer. Wiita had requested the meeting, and Beer, knowing that Wiita was going to disclose the padding of expense reports which had been occurring on their crew, asked to accompany him. At the meeting, Wiita and Beer told Dayton about widespread cheating and falsification of expense accounts. Both admitted they had falsified expense reports but emphasized that they had stopped doing so around July of 1989.

Upon being apprised of this information, Dayton advised them that he was required under Minnesota law to report the matter to the legislative auditor. After officially taking office on January 8, 1991, Dayton informed the legislative auditor, who in turn conducted investigations into the allegations made by Wiita and Beer.

The auditor's subsequent interviews indicated that auditor Alan Folie and crew chief Steve Baumgardt had been making false expense reports and that although other members of the Anoka crew had also

submitted false expense reports, all but Folie had stopped doing so after mid–1989. Based on this information, Dayton placed Folie and Baumgardt on investigatory suspension. In his final investigation report dated March 5, 1991, the legislative auditor also informed Dayton that allegations had been made that Beer had submitted false expense reports even after mid–1989. Based on this information and Beer's admission that he had submitted some false expense reimbursement claims, Beer was placed on investigatory suspension on March 7, 1991.

After receiving the complete investigation from the legislative auditor, Dayton began his own investigation, interviewing 14 employees. On March 18, 1991, he interviewed Beer, who admitted that on approximately six to eight occasions he had gone golfing and then had falsely submitted these golf receipts to support claims for dinner reimbursement. However, he claimed that his supervisor, Steve Baumgardt, approved of such a practice.[1] Beer claimed that all other expense reports were actual and correct.

The following day, March 19, Dayton interviewed Folie, who indicated the Beer had also falsified several mileage claims. On March 20, Dayton met again with Beer to discuss these new allegations. Beer said that he thought the mileage amounts were actual amounts, but he could not explain all of the discrepancies cited by Dayton.[2] The next morning, Beer called Dayton and said that he had something he "urgently" needed to discuss with him. At a March 22 meeting, Beer said that he had checked the mileages and found them to be in error, but he claimed that these errors were unintentional.

After analyzing all of the testimony, Dayton decided to discharge Beer, Folie, and Baumgardt. Dayton notified Beer that he was being discharged for submitting numerous false expense reports, for being untruthful during the investigation, and for compromising the integrity and credibility of the state auditor's office. Folie and Baumgardt were also discharged for many of the same reasons as Beer. Dayton noted that Folie was being discharged for a practice of submitting false expense reports "systematically during a period of several years," while Baumgardt was discharged not only for continuing to submit false reports even after being warned in mid–1989 to stop doing so but also for knowingly allowing the false expense reporting practices of those under his supervision to continue. In addition, Baumgardt's immediate supervisor was demoted two levels and was suspended for ten days for not undertaking a proper investigation of Wiita's claims of false expense reporting.[3] Finally, Dayton commended Wiita for stopping his submission of false expense reports of his own accord in mid–1989, for attempting to persuade other auditors to stop that practice, and for informing management of the false expense reporting practices.

After these actions were taken, MAPE brought an action challenging Beer's discharge. At the arbitration hearing on October 23, 1991, the arbitrator found that the state auditor did not have just cause to discharge Beer. Although the arbitrator found that employers must be able to discharge employees as protection from false claims and that Beer's submission of inaccurate mileage and meal expenses was done "with the intent to obtain expense reimbursements that he knew he was not entitled to receive," the arbitrator nevertheless concluded that Beer's "voluntary

1. Dayton pressed him on this contention because Baumgardt had earlier told him that he had not approved such a practice, but Beer maintained that Baumgardt had allowed this practice to continue.

2. Dayton estimated that Beer had submitted at least 70 claims for excess mileage, and the Attorney General ultimately determined that there were 104 such false claims.

3. In addition, Dayton reprimanded two other members of the Anoka crew against whom allegations had been made, but these two were not discharged because Dayton could not find much direct evidence to corroborate any of the allegations against them.

confession about his past misconduct, though incomplete, implies an intention to reform and thereby eliminate[s] the risk to the Employer of harm from future similar misconduct." The arbitrator therefore concluded that "though there was clearly just cause to discipline the grievant, there was not just cause to discharge him, because his continued employment would cause no significant adverse effect to the Employer." The arbitrator ordered the state auditor to reinstate Beer and to give him back pay for the two weeks of his investigatory suspension. However, no back pay was awarded for the period following his discharge because the arbitrator ruled that the employer should not suffer an economic loss for its choice of discipline that was occasioned by Beer's misconduct.

The arbitration award was then appealed to the Ramsey County District Court. In vacating the arbitration award, the district court stated:

> In sum, there is an explicit, well-defined, and dominant public policy favoring the proper expenditure of public funds, the proper accounting for public funds, and the honesty and integrity of those charged with insuring that public funds are properly and honestly expended. Because Beer was one of the guardians of this system, his activities struck a blow at its very heart. His reinstatement might not adversely affect the operations of the State Auditor[4] but it would further damage the operation of the legislatively created system for monitoring public spending by reducing the public's confidence in that system and by demonstrating to other public employees that no serious consequences flow from a deliberate violation of the public's trust.

The district court noted that the contract and the underlying legislation both emphasize that the public welfare is an overriding concern. The court concluded that because the arbitration award failed to acknowledge that principle, the award must be vacated.

The court of appeals reversed the trial court, holding that the arbitrator's award did not conflict with a well-defined and dominant public policy. *State, Office of the State Auditor v. Minnesota Ass'n of Professional Employees*, 493 N.W.2d 591 (Minn.App.1992). The court of appeals noted the traditional deference courts give to an arbitrator's interpretation of a contract and further stated that no case in Minnesota has expressly adopted a public policy exception. *Id.* at 593. The court concluded that "[w]hile an employee's conduct may be against public policy, it does not necessarily follow that an arbitration award reinstating the employee violates public policy." *Id.* at 594. This court granted review. On appeal, the issues before us are whether Minnesota should recognize a public policy which would justify vacating an arbitrator's award, and, if so, whether the arbitrator's award in this case reinstating Beer should be vacated because it violated that public policy.

 In analyzing whether this court should vacate the arbitrator's award on public policy grounds, it is important to recognize that this court's review of an arbitrator's decision is limited. It is well settled that

> an arbitrator, in the absence of an agreement limiting his authority, is the final judge of both law and fact, including the interpretation of the terms of any contract, and his award will not be reviewed or set aside for mistake of either law or fact in the absence of fraud, mistake in applying his own theory, misconduct, or other disregard of duty.

*Cournoyer v. American Television & Radio Co.*, 249 Minn. 577, 580, 83 N.W.2d 409, 411 (1957) (footnotes omitted). This court has noted that only when it is established that arbitrators have clearly exceeded their powers must a court vacate an arbitration award. *State v. Berthiaume*, 259 N.W.2d 904, 910 (Minn.1977). Every reasonable presumption must be exercised in favor of the finality and validity of the arbitration award, *National Indem. Co. v. Farm Bureau Mut. Ins. Co.*, 348 N.W.2d 748, 750 (Minn.1984), and courts will not overturn

---

**4.** The court accepts, as it must, the arbitrator's finding in this regard.

an award merely because they disagree with the arbitrator's decision on the merits, *Berthiaume,* 259 N.W.2d at 910; *Children's Hosp., Inc. v. Minnesota Nurses Ass'n,* 265 N.W.2d 649, 652 (Minn.1978). Thus, the scope of judicial review of an arbitration award is extremely narrow.

In the present case, the parties' collective bargaining agreement is governed by the Public Employees Labor Relations Act (PELRA), and under the terms of that agreement, the arbitrator has the authority to determine whether the state auditor had "just cause" to discipline or discharge Beer. While the agreement specifies that discipline shall be imposed on an employee only for "just cause," it fails to define what constitutes just cause.

■ When faced with such an ambiguous term in an agreement, an arbitrator may look to many sources, and his or her award will be upheld as long as it "draws its essence" from the agreement. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). In this case, by failing to define specifically what acts constitute just cause for discharge, the parties left this decision to an arbitrator, and the role of this court in such cases is "solely to determine whether specific language in the agreement or submission precludes [the arbitrator's decision]." *City of Bloomington v. Local 2828, AFSCME,* 290 N.W.2d 598, 602 (Minn.1980).

■ Under the terms of this agreement, it was the arbitrator's duty to determine whether there was "just cause" to discharge Beer, and the arbitrator's powers were limited only by the provision which stated, "The Arbitrator shall be without power to make decisions contrary to or inconsistent with or modifying or varying in any way the application of laws, rules, or regulations having the force and effect of law." [5]

The state auditor first claims that the arbitrator's award should be vacated under section 572.19, subd. 1(3) of the Uniform Arbitration Act (UAA), which provides that a court shall vacate an arbitration award when "[t]he arbitrators exceeded their powers." Minn.Stat. § 572.19, subd. 1(3) (1992).

In evaluating challenges to the scope of an arbitrator's powers, this court's scope of review is very limited:

> The scope of the arbitrators' powers is a matter of contract to be determined from a reading of the parties' arbitration agreement, and an arbitrators' award will be set aside by the courts only when the objecting party meets its burden of proof that the arbitrators have *clearly* exceeded the powers granted to them in the arbitration agreement; courts will not overturn an award merely because they may disagree with the arbitrators' decision on the merits.

*Children's Hosp.,* 265 N.W.2d at 652 (emphasis added). Under this standard, the arbitrator clearly did not exceed his powers. As the Ramsey County District Court observed, there is nothing in the record to suggest that the arbitrator made this award in manifest disregard of the contract, the principles of contract construction, or in breach of the law of the shop. *See Ramsey County v. AFSCME, Council 91, Local 8,* 309 N.W.2d 785, 792 (Minn. 1981).

Furthermore, because the contract did not define the meaning of "just cause" or limit the available remedies, the arbitrator was free to adopt a reasonable definition and to craft a remedy which would not conflict with the terms of the agreement. *Children's Hosp.,* 265 N.W.2d at 653. The United States Supreme Court also has noted that "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the

---

5. Although the state auditor asserts that this language places a direct limit on the arbitrator's power and explicitly incorporates the "public policy" exception into the contract, this language is just standard collective bargaining language rather than a limitation on the arbitra-

tor's powers or an explicit incorporation of the public policy exception. *See, e.g., City of Bloomington,* 290 N.W.2d at 601 (containing similar standard contract language); *Berthiaume,* 259 N.W.2d at 908 n. 4 (same).

merits of the awards." *Enterprise Wheel & Car Corp.*, 363 U.S. at 596, 80 S.Ct. at 1360.

Given these guidelines, the arbitrator's decision appears to "draw its essence" from the contract. *Ramsey County*, 309 N.W.2d at 792. There are no viable grounds for vacating the award under Minn.Stat. § 572.19, subd. 1(3).

Nevertheless, the state auditor asserts that this court should vacate the arbitrator's award on public policy grounds. The United States Supreme Court has noted that a "public policy exception" may, in limited instances, provide a basis for courts to vacate arbitration awards. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). The exception is, however, a narrow one.

In *W.R. Grace*, the United States Supreme Court adopted the public policy exception. In so doing, the Court noted that an arbitrator's award may not be overruled merely because a court believes that its interpretation of the contract is a better one, and that, in general, an arbitration award must be enforced, even if the basis for the arbitrator's decision is ambiguous, as long as the award "draws its essence" from the collective bargaining agreement. *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. at 2182 (*citing Enterprise Wheel & Car Corp.*, 363 U.S. at 596–98, 80 S.Ct. at 1360–61). The Supreme Court recognized, however, that an arbitration award may be set aside, just as a common law contract, if it violates some well-defined public policy:

> As with any contract, * * * a court may not enforce a collective-bargaining agreement that is contrary to public policy. * * * If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it. Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."

*Id.* 461 U.S. at 766, 103 S.Ct. at 2183 (citations omitted).

In *Misco*, the Court explained in greater detail what it meant by a "well defined and dominant" public policy:

> First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in [*W.R. Grace*] does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 U.S., at 766 [103 S.Ct. at 2183]. At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced.

484 U.S. at 43, 108 S.Ct. at 373. The Court held that the public policy exception had not been properly invoked in *Misco* because the lower courts had not attempted to review "existing laws and legal precedents in order to demonstrate that they establish a 'well-defined and dominant' policy against the operation of dangerous machinery while under the influence of drugs." *Id.* at 44, 108 S.Ct. at 374. The Court noted that although such a policy was rooted in common sense, such "general considerations of supposed public interests" were not sufficient to overturn the arbitrator's award. *Id.*

Thus, under *Misco*, the public policy exception has been narrowly defined. A court may set aside an arbitration award only if (1) the collective bargaining agreement contains terms which violate public policy, or (2) the arbitration award creates an explicit conflict with other "laws and legal precedents." *Id.* at 43, 108 S.Ct. at

373. Here, there is no evidence that the collective bargaining agreement violated public policy in any way; therefore, our inquiry turns on whether the arbitrator's award violates some public policy.

In evaluating this latter contention, the Supreme Court's decision in *Misco* fails to provide the necessary guidance. While the majority states that an arbitration award will be vacated on public policy grounds only where the *award* creates an express conflict with other "laws and legal precedents," *id.*, Justice Blackmun's concurrence, joined by Justice Brennan, states:

> In particular, the Court does *not* reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. Nor do I understand the Court to decide, more generally, in what way, if any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

*Id.* at 46, 108 S.Ct. at 375 (Blackmun, J., concurring) (emphasis added) (citation omitted).

While this issue thus remains unresolved, many courts, when confronted with similar claims, have focused on the arbitrator's award and have refused to strike down an award that is not in direct conflict with any explicit public policy.[6] While some of these courts have held that they will not overrule an arbitrator's award unless it actually violates some positive law or otherwise compels illegal conduct, even those courts which have taken a broader view of the public policy exception, such as the Eighth Circuit, at least require that the award itself be inconsistent with some public policy before it will be vacated. *See Iowa Elec. Light & Power Co. v. Local Union 204, Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427 & n. 3 (8th Cir.1987).

 Under the facts of this case, while Beer's *conduct* would appear to violate a well-defined and dominant public policy against the embezzlement of state funds by public employees,[7] we cannot automatically conclude that the arbitrator's *award* reinstating Beer violates that public policy. Rather, in evaluating the arbitrator's award under a public policy exception, courts must focus not on the grievant's conduct but on whether enforcement of the award would violate some well-defined and dominant public policy. Although we believe that this state has a strong public policy against the embezzlement of state funds and that Beer's conduct would have provided sufficient grounds for an arbitrator to find "just cause" for discharge, we

---

6. *See, e.g., Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200, 1212–17 (9th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *Board of County Comm'rs v. Kimball & Assocs.,* 860 F.2d 683, 688 (6th Cir.1988), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *Daniel Constr. Co. v. Local 257, Int'l Bhd. of Elec. Workers,* 856 F.2d 1174, 1181–82 (8th Cir.1988), *cert. denied,* 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 200 (1989); *Oil, Chem. & Atomic Workers, Local 4–228 v. Union Oil Co.,* 818 F.2d 437, 441–43 (5th Cir.1987); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 78 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *Bevles Co. v. Teamsters Local 986,* 791 F.2d 1391, 1393 (9th Cir.1986), *cert. denied,* 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987); *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n.,* 790 F.2d 611, 617 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

7. *See* Minn. Const. art. V, § 6 (state officers are sworn to discharge faithfully the duties of their office to the best of their judgment and ability); Minn. Const. art. XI, § 13 (officers charged with the safekeeping of state funds are required to give ample security for them and to keep accurate entries of each sum received); Minn.Stat. § 6.01 (1992) (specifying the duties of a state auditor); Minn.Stat. § 6.53 (1992) (providing a penalty for refusing to assist state auditor); Minn.Stat. § 43A.38, subd. 4 (1992) (providing that employees shall not use state property for private interests); Minn.Stat. §§ 326.165–326.229 (defining the rules of conduct for public accountants).

recognize that the parties bargained for the arbitrator's interpretation of the contract and that even our strong disagreement with the result does not provide sufficient grounds for vacating the arbitrator's award. *See Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–371; *Enterprise Wheel & Car Corp.,* 363 U.S. at 596, 80 S.Ct. at 1360; *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 615 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

In this case, the arbitrator explicitly found that Beer's voluntary confession, though incomplete, implied an intention to reform and eliminated the risk to the state auditor of future similar misconduct, thereby failing to provide sufficient "just cause" for discharge. In evaluating this evidence, we cannot say that the arbitrator's interpretation of "just cause" fails to "draw its essence" from the collective bargaining agreement or that his award reinstating Beer violates public policy, particularly where Beer's conduct was not directly related to his performance as a local government auditor [8] and where the arbitrator has explicitly found that Beer's reinstatement would cause no significant adverse effect to the employer. Given the arbitrator's findings, which we are bound to accept, we cannot conclude that the arbitrator's award reinstating Beer violated any well-defined and dominant public policy. Thus, the arbitrator's reinstatement of Beer must be upheld.[9]

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

---

[8.] Beer's misconduct was related to submitting false expense reports. There was no evidence that his actual audits of local governments were ever falsified or that he failed to perform his audits accurately. Thus, we cannot say that his reinstatement would place the public at risk or jeopardize the performance of the state auditor's office.

[9.] While we refuse to invoke a public policy exception in the present case, we express no opinion on whether we would adopt such a public policy exception on a different set of facts.