*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0277**

Law Enforcement Labor Services, Inc.,
Appellant,

vs.

Blaine Police Department of Blaine, Minnesota,
Respondent.

**Filed August 10, 2015
Affirmed
Larkin, Judge**

Anoka County District Court
File No. 02-CV-14-4278

Adrianna H. Shannon, Shannon Law, LLC, Minnetonka, Minnesota (for appellant)

Susan K. Hansen, Madden Galanter Hansen, LLP, Plymouth, Minnesota (for respondent)

Margaret A. Luger-Nikolai, Nicole M. Blissenbach, Education Minnesota, St. Paul, Minnesota (for amicus curiae Education Minnesota)

Considered and decided by Reyes, Presiding Judge; Peterson, Judge; and Larkin, Judge.

**U N P U B L I S H E D   O P I N I O N**

**LARKIN**, Judge

Appellant-union challenges the district court's confirmation of an arbitration award, arguing that the award violates public policy. We affirm.

## FACTS

This appeal stems from an arbitrator's denial of two union grievances filed by appellant Law Enforcement Labor Services Inc. (the union) on behalf of its member, Karen Hamann, in response to a written reprimand and suspension imposed by Hamann's employer, respondent Blaine Police Department (the department). The department requires its detectives to be on call for one-week periods, during which time the detectives must be available for assignments outside of the normal duty schedule. The department also has an overtime program called Reimbursable Police Services (RPS), through which officers provide police services to private entities pursuant to a contract with the department. On-call detectives may work RPS overtime so long as they arrange for another detective to cover their on-call duty during the RPS shift and notify their sergeant of the substitution.

Hamann is a detective with the department. On June 24, 2012, she worked an RPS shift while she was the assigned on-call detective. In July, the department issued Hamann a written reprimand for working the RPS shift without arranging coverage for her on-call duty. Hamann informed her union steward that she wanted to file a grievance. The union steward completed a grievance report based on information that Hamann provided, and Hamann signed the grievance. The grievance stated, in relevant part: "[Hamann] did have [Detective J.S.] cover her 'on call' for the period of time in which the RPS job was worked. [Hamann] did advise [Sergeant B.O.] of the switch." The union filed the grievance on Hamann's behalf.

The department initiated an internal-affairs investigation regarding Hamann's statements in her grievance. The investigator determined that Hamann's statements that she obtained coverage for her on-call shift and that she informed her supervisor were false. The department concluded that Hamann's false statements violated its policies including "Conduct Unbecoming an Officer" and "Integrity." The former provides that "an officer must at all times conduct themselves in a manner which does not bring discredit to themselves, the department, the City, or the law enforcement profession." The latter provides that "[d]epartment employees must scrupulously avoid any conduct which might compromise the integrity of themselves, their fellow officers, or the department." The department suspended Hamann for 32 hours based on the statements in her grievance. Hamann, through the union, filed another grievance challenging the suspension.

The parties agreed to consolidate the two grievances for arbitration purposes. A three-day arbitration hearing was held in December 2013 and January 2014. The arbitrator issued a written award. In addressing whether the 32-hour suspension was justified, the arbitrator noted that "[Hamann] did not claim on her grievance report that she was treated unfairly" and that "[Hamann] ma[d]e affirmative representations that were false." The arbitrator also noted that the internal-affairs investigator "determined that [Hamann's] representation that Det. J.S. covered her call time on June 24, 2012 was false, and [Hamann's] representation that she had notified Sgt. B.O. of the change in the on-call coverage was false." The arbitrator continued: "The undersigned opines that there is no evidence in this record to support the Union's argument that [Hamann] was

3

[]not knowingly or deliberately untruthful." The arbitrator explained that Hamann "had no independent recollection of making arrangements with anyone to cover her assigned duties as required" and "failed to substantiate that anyone had been available, willing and agreed to cover for [her]." The arbitrator noted that "the record is replete with contradictory statements by [Hamann] that she could not recall who she had to cover her assigned duties[.] However, by the 'process of elimination' she reasoned it had to be Det. J.S." The arbitrator explained:

> . . . [Hamann's] account of events leading up to grievances [was] not credible or plausible, and certainly reflect[s] in a manner which may bring discredit to herself, the department, the [c]ity or the law enforcement profession. The undersigned opines that [Hamann's] conduct in making false statements [is] unjustified and lack[s] good reason for bring[ing] other officers' credibility into question [regarding] events that [Hamann] demonstrated she had no independent recollection of . . .

The arbitrator found that Hamann's grievance statements violated department policies including "Conduct Unbecoming an Officer," "Integrity," "Compliance with Lawful Orders," and "Attention to Duty." The arbitrator discussed "Conduct Unbecoming an Officer" at length, noting that "an officer must at all times conduct [herself] in a manner [that] does not bring discredit to [herself], the department, the city, or the law enforcement profession." The arbitrator also noted that "an officer's conduct is closely scrutinized, and when their actions are found to be excessive, unwarranted, or unjustified, they are criticized far more severely than comparable conduct of persons in other walks of life."

4

The arbitrator concluded that the department had just cause to issue the written reprimand and to impose the 32-hour suspension, and that both disciplines were reasonable and progressive. The arbitrator denied the union's grievances and sustained the written reprimand and the suspension.

The union moved the district court to vacate the portion of the arbitration award sustaining Hamann's suspension, arguing that it violates public policy. The district court denied the motion and confirmed the arbitration award. This appeal follows.

## D E C I S I O N

"Arbitration is a proceeding favored in the law." *City of Brooklyn Ctr. v. Law Enforcement Labor Servs., Inc.*, 635 N.W.2d 236, 241 (Minn. App. 2001), *review denied* (Minn. Dec. 11, 2001). "[T]he scope of judicial review of an arbitration award is extremely narrow." *State Office of State Auditor v. Minnesota Ass'n of Prof'l Employees*, 504 N.W.2d 751, 755 (Minn. 1993).

> It is well settled that an arbitrator, in the absence of an agreement limiting his authority, is the final judge of both law and fact, including the interpretation of the terms of any contract, and his award will not be reviewed or set aside for mistake of either law or fact in the absence of fraud, mistake in applying his own theory, misconduct, or other disregard of duty.

*Id.* at 754 (quotation omitted). Generally, courts may vacate arbitration awards "only when it is established that arbitrators have clearly exceeded their powers." *Id.* "Every reasonable presumption must be exercised in favor of the finality and validity of the arbitration award, and courts will not overturn an award merely because they disagree with the arbitrator's decision on the merits." *Id.* at 754-55 (citation omitted).

5

But "in limited circumstances, a 'public policy exception' may provide a basis for courts to vacate an arbitration award." *Brooklyn Ctr.*, 635 N.W.2d at 241 (quotation omitted). "Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *State Auditor*, 504 N.W.2d at 756 (quotation omitted). "The question of public policy is ultimately one for resolution by the courts, and therefore we need not show deference to the district court's conclusion." *Brooklyn Ctr.*, 635 N.W.2d at 241 (citation omitted).

The union argues for application of the public-policy exception in this case, based on the Public Employment Labor Relations Act (PELRA). Minn. Stat. §§ 179A.01-.25 (2014). PELRA provides: "It is the public policy of this state and the purpose of sections 179A.01 to 179A.25 to promote orderly and constructive relationships between all public employers and their employees." Minn. Stat. § 179A.01(a). PELRA states that "[t]he importance or necessity of some services to the public can create imbalances in the relative bargaining power between public employees and employers" and "[a]s a result, unique approaches to negotiations and resolutions of disputes between public employees and employers are necessary." Minn. Stat. § 179A.01(b). PELRA further states that "[u]nresolved disputes between the public employer and its employees are injurious to the public as well as to the parties" and "[a]dequate means must be established for minimizing them and providing for their resolution." Minn. Stat. § 179A.01(c). PELRA's "overall policy is best accomplished by . . . establishing special . . . procedures . . . regarding public employment relationships which will provide for the protection of

6

the rights of the public employee, the public employer, and the public at large." Minn. Stat. § 179A.01(c)(3). PELRA therefore provides that "[a]ll contracts must include a grievance procedure providing for compulsory binding arbitration of grievances including all written disciplinary actions." Minn. Stat. § 179A.20, subd. 4(a).

The union argues that the "challenged portion of the award must be vacated under the public-policy exception because . . . it violates PELRA's explicit, well-defined, and dominant public policy to promote orderly and constructive public-employment relations" through the use of grievance arbitration as the method to resolve workplace disputes. The union argues that the award in this case violates the public policy favoring grievance arbitration because "the nature and tendency of arbitration awards that sustain grievance-based discipline (as does the subject award) is to deter public employees from filing grievances and, consequently, to leave public-workplace disputes unresolved." Essentially, the union asks us to recognize a PELRA-based public policy that prohibits a public employer from disciplining an employee based on the employee's statements in a grievance. The union argues that "PELRA's public policy [prohibits] a public employer from disciplining a grievant for lying in her grievance."

When determining whether an arbitration award violates public policy, courts examine "whether the award created any explicit conflict with other laws and legal precedents rather than an assessment of general considerations of supposed public interests." *State Auditor*, 504 N.W.2d at 756 (quotations omitted). The arbitration award in this case does not explicitly conflict with PELRA's policy favoring grievance arbitration because the dispute between Hamann and the department was resolved in

7

grievance arbitration. In fact, the award does not explicitly conflict with any of PELRA's provisions: although PELRA sets forth a public policy favoring the use of grievance arbitration to resolve disputes between public employers and employees, it does not prohibit discipline based on statements in a grievance.

The union's arguments do not persuade us to reach a different conclusion. For example, the union argues that PELRA prohibits public employers from "discharging or otherwise discriminating against an employee because the employee has signed or filed an affidavit, petition, or complaint or given information or testimony under [PELRA]," Minn. Stat. § 179A.13, subd. 2(4), and that PELRA therefore supports a policy prohibiting discipline based on statements in a grievance. Although section 179A.13, subdivision 2(4), protects an employee's right to initiate and participate in the process set forth under PELRA, it does not immunize statements made by the employee during the process. The fact that the union has to extrapolate a policy prohibiting discipline based on statements in a grievance from section 179A.13, subdivision 2(4), shows that the proposed policy is not well-defined and dominant.

In addition, the union relies on *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302 (Minn. 2007), a defamation case, and argues that "in the context of defamation law . . . the supreme court absolutely privileges statements made in pleadings," even intentionally false statements, and that judicial pleadings are "similar to grievances." The union also relies on *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964), and draws an analogy to the First Amendment context, where the Supreme Court has "reminded us" that "sometimes we must protect even false statements in order to protect statements that

8

are true." But the defamation and First Amendment caselaw on which the union relies does not set forth a well-defined public policy prohibiting discipline based on statements in a grievance. Indeed, the fact that the union has to draw analogies to other legal doctrines to identify the public policy on which it relies shows that the policy is not well-defined and dominant.

The absence of a well-defined and dominant public policy distinguishes this case from *Brooklyn Ctr.*, where this court reversed a district court's order confirming an arbitrator's award and remanded with instructions to vacate the award based on the public-policy exception. 635 N.W.2d at 244. In *Brooklyn Ctr.*, we noted that "there exists in Minnesota a well-defined and dominant public policy that imposes upon governmental units an affirmative duty to take action to prevent and to sanction sexual harassment and sexual misconduct by law enforcement officers." *Id.* at 242. We identified several direct sources of support for that public policy: "administrative rules governing the licensing of peace officers," which "allow for disciplinary action— including revocation of a license—against licensees who engage in sexual harassment"; 42 United States Code, section 1983, under which "a municipality that fails to take remedial action after having learned of repeated incidents of misconduct committed by a police officer may be deemed to have been deliberately indifferent to such misconduct and therefore liable to a victim"; and Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act, both of which "prohibit employers—including states and political subdivisions—from engaging in sexual harassment" and impose a "duty to prevent sexual harassment in the workplace." *Id.* at 242-43 (quotation omitted). Having

9

identified a well-defined public policy, we held that "an arbitrator's decision to reinstate a police officer who was terminated by his municipal employer violates public policy and will not be enforced where the police officer had engaged in an egregious and long-standing pattern of sexual harassment." *Id*. at 237. Unlike the circumstances in *Brooklyn Ctr.*, we do not discern a well-defined and dominant public policy justifying application of the public-policy exception in this case.

In conclusion, we note that the public-policy exception is narrowly defined and that there is not "a broad judicial power to set aside arbitration awards as against public policy." *State Auditor*, 504 N.W.2d at 756. Because the award in this case does not explicitly conflict with PELRA's well-defined policy favoring resolution of disputes between a public employer and its employees through grievance arbitration, and because the union has not established a well-defined policy prohibiting an employer from disciplining an employee based on statements in a grievance, there is no basis to apply the public-policy exception in this case. We therefore affirm the district court's order confirming the arbitration award.

**Affirmed.**