Scott PETERSON, Respondent,

Roger Smith, Plaintiff,

v.

CITY OF MINNEAPOLIS, Minnesota, Appellant.

A15-1711

Supreme Court of Minnesota.

Filed: April 12, 2017

Erik F. Hansen, Elizabeth E. Cadem, Burns & Hansen, P.A., Minneapolis, Minnesota, for respondent.

Susan L. Segal, Minneapolis City Attorney, Timothy S. Skarda, Michael B. Bloom, Andrea K. Naef, Assistant City Attorneys, Minneapolis, Minnesota, for appellant.

Susan L. Naughton, Saint Paul, Minnesota, for amici curiae League of Minnesota Cities and Association of Minnesota Counties.

Robert Small, Minnesota County Attorneys Association, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Beverly J. Wolfe, Assistant County Attorney, Martin D. Munic, Senior Assistant County Attorney, Minneapolis, Minnesota, for amicus curiae Minnesota County Attorneys Association.

Dyan J. Ebert, Melinda M. Sanders, Julie L. Fisk, Quinlivan & Hughes, P.A., Saint Cloud, Minnesota; and Jessica L. Roe, Shannon Cooper, Roe Law Group, Minneapolis, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

Stephen C. Fiebiger, Stephen C. Fiebiger Law Office, Chtd., Burnsville, Minnesota; and Frances E. Baillon, Baillon Thome Jozwaik & Wanta, LLP, Minneapolis, Minnesota; and

## OPINION

GILDEA, Chief Justice.

The question presented in this case is whether an employee's complaint to his employer's human resources department suspended the running of the statute of limitations for the employee's age discrimination claim under the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.44 (2016). The district court concluded that the employer's investigation did not suspend the statute of limitations. The court of appeals reversed, holding that the parties were "voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination" under the MHRA that suspended the statute of limitations. Because we likewise conclude that the parties' participation in the employer's process suspended the statute of limitations, we affirm.

## FACTS

Respondent Scott Peterson[1] worked as a police officer for appellant City of Minneapolis from 1987 to 2012. In October 2011, the City transferred Peterson from his position with the Violent Offender Task Force to another police unit. At the time of the transfer, Peterson was 54 years old. Peterson argues that he was transferred because of his age. In November 2011, Peterson filed a complaint with the City's human resources department under the City's Respect in the Workplace Policy (Workplace Policy), claiming that the transfer was because of age discrimination. The City's human resources department investigated the claim. In January 2013, more than a year after Peterson's initial complaint, the City concluded that the transfer was not the result of age discrimination.

On June 26, 2013, Peterson filed a claim with the Minnesota Department of Human Rights, which he later withdrew. *See* Minn. Stat. § 363A.28, subd. 3(a) (authorizing a complainant to bring a complaint as a civil action, as a charge with a local commission, or as a charge with the Commissioner of the Department of Human Rights). And on March 12, 2014, Peterson commenced this action against the City of Minneapolis in Hennepin County District Court, alleging that the City discriminated against him based on his age in violation of the MHRA.

The City moved for partial summary judgment, arguing that Peterson's MHRA claim was not timely filed. The district court granted the City's motion for partial summary judgment, holding that Peterson's claim was not filed within the one-year limitations period in Minn. Stat. § 363A.28, subd. 3.

The court of appeals reversed. *Peterson v. City of Minneapolis*, 878 N.W.2d 521, 522 (Minn. App. 2016). The court of appeals concluded that the parties were engaged in a "dispute resolution process" during the period of time in which the City's human resources department was investigating Peterson's claim, which suspended the statute of limitations under Minn. Stat. § 363A.28, subd. 3(b). 878 N.W.2d at 522-23. We granted the City's petition for review.

## ANALYSIS

We are asked to decide whether Peterson's claim was timely filed under Minn.

1. Although Roger Smith joined this lawsuit as a plaintiff, he did not appeal following the district court's dismissal of his claims, and is therefore not a party to this appeal.

Stat. § 363A.28, subd. 3. Section 363A.28, subdivision 3(a), states that a claim under the MHRA must be "brought as a civil action ... or filed in a charge with the [Commissioner of the Department of Human Rights] within one year after the occurrence of the [unlawful discriminatory] practice." But the statute provides that the limitations period is "suspended during the time a potential charging party and respondent are voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination under this chapter, including arbitration, conciliation, mediation or grievance procedures...."[2] *Id.*, subd. 3(b). The parties agree that Peterson brought his claim more than 1 year after the occurrence of the unlawful discriminatory practice, but they disagree about whether his action was timely.

Peterson contends that his complaint to the City's human resources department and the department's subsequent investigation triggered Minn. Stat. § 363A.28, subd. 3(b), and suspended the 1-year limitations period. Because such a suspension would bring Peterson's claim within the 1-year limitations period, he argues that his claim was not time-barred under the statute. On the other hand, the City of Minneapolis argues that Peterson's complaint and the subsequent human resources investigation did not suspend the limitations period. Accordingly, the City contends that Peterson's suit was not timely filed.

## I.

■ The parties' arguments require that we interpret the suspension provision

in section 363A.28, subdivision 3(b). We review statutory interpretation issues de novo. *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 861 (Minn. 2010). The "goal of all statutory interpretation is to ascertain and effectuate the intention of the legislature." *Christianson v. Henke*, 831 N.W.2d 532, 536 (Minn. 2013) (citations omitted) (internal quotation marks omitted). When interpreting statutes, our first step is to determine if the statute is ambiguous, meaning that the statute is subject to more than one reasonable interpretation. *Id.* at 536-37 (citations omitted). If the statute is unambiguous, we enforce the language of the statute and " '[do] not explore the spirit or purpose of the law.' " *Id.* at 537 (quoting *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 836 (Minn. 2012)).

The parties dispute three different parts of the suspension provision in section 363A.28, subdivision 3(b): whether they were "voluntarily engaged" in a process, whether that process was a "dispute resolution process," and whether the process "involv[ed] a claim of unlawful discrimination" under the MHRA. We address each argument in turn.

## A.

■ We turn first to the question of whether the parties were "voluntarily engaged" in a process, as the suspension provision requires. The City argues that the term "engage" requires both parties to actively participate in the process, and under this definition Peterson was not "en-

---

**2.** The full subdivision reads:
   The running of the one-year limitation period is suspended during the time a potential charging party and respondent are voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination under this chapter, including arbitration, conciliation, mediation or

grievance procedures pursuant to a collective bargaining agreement or statutory, charter, ordinance provisions for a civil service or other employment system or a school board sexual harassment or sexual violence policy.
Minn. Stat. § 363A.28, subd. 3(b).

gaged" in the process the City's Workplace Policy provides. Although the City concedes that Peterson participated in an interview during the investigation, it argues this participation was not "voluntary" because Peterson could have been compelled to participate as a condition of his continued employment. Peterson, on the other hand, argues that he "freely chose" to participate in the process, both by filing his complaint and undergoing an interview.

■ The MHRA does not define "voluntarily engaged," but dictionary definitions are helpful. The term "voluntary" means "[a]rising from or acting on one's own free will." *The American Heritage Dictionary of the English Language* 2002 (3d ed. 1996). The term "engage" means "[t]o involve oneself or become occupied; participate: *engage in conversation.*" *Id.* at 610. Taking these definitions together, to be "voluntarily engaged" in a process, a party must act on its own free will to involve itself in the qualifying process.

Consistent with these definitions, Peterson was voluntarily engaged in the City's process. Peterson decided to file the complaint with the City's human resources department even though the Workplace Policy did not require him to do so. This decision suggests that Peterson's actions were voluntary and not coerced. Through his choice to file the complaint, Peterson involved himself in the investigation process, including the requirement that he submit to a later interview. Peterson's decision to file his complaint is sufficient to satisfy Minn. Stat. § 363A.28, subd. 3(b)'s requirement that he "voluntarily engage[ ]" in the process.

### B.

■ Having determined that Peterson and the City were "voluntarily engaged" in the process, we next turn to whether the City's investigation under its Workplace Policy qualifies as a "dispute resolution process" under Minn. Stat. § 363A.28, subd. 3(b). The court of appeals concluded that the Workplace Policy is such a "dispute resolution process" because it could resolve Peterson's claim. *Peterson*, 878 N.W.2d at 528. Under the court's interpretation, the Workplace Policy authorizes the City to prevent discriminatory action by disciplining offending parties and to reinstate Peterson to his former position. *Id.* at 526. The court also rejected the City's argument that a "dispute resolution process" must utilize a third-party neutral. *Id.*

The City disagrees with the court of appeals' analysis. The City argues that its Workplace Policy is not a "dispute resolution process." The City relies in part upon the reasoning of a federal district court decision that held, based on the examples of dispute resolution processes listed in the statute, that a "dispute resolution process" requires the presence of a third-party neutral and does not include "informal negotiations" between litigants. *Wussow v. Andor Tech.*, No. 12-614 (DSD/TNL), 2012 WL 5199528, at *4 (D. Minn. Oct. 22, 2012). The City alternatively suggests that the district court here correctly interpreted the phrase to require a formal process that has as its central focus the resolution of claims under the MHRA. The City contends that its Workplace Policy does not meet the requirements outlined by either the district court or *Wussow* because the policy is informal, does not resolve disputes, and does not involve a third-party neutral.

Peterson disagrees with the City's interpretation of "dispute resolution process." Peterson defines the phrase as "any procedure for settling a disagreement." *See Alternative Dispute Resolution, Black's Law Dictionary* (10th ed. 2014) (defining "alternative dispute resolution" as "[a]ny procedure for settling a dispute by means other

than litigation, as by arbitration or mediation"). Under this definition, Peterson concludes that the process is not required to have a third-party neutral and that the City's Workplace Policy is sufficiently formal. Additionally, Peterson contests the applicability of *Wussow* to the current case, arguing that it is factually distinguishable. Peterson concludes that the Workplace Policy offers a potential resolution for his claims and therefore that it is a "dispute resolution process" under Minn. Stat. § 363A.28, subd. 3(b).

When interpreting the phrase "dispute resolution process," it is important that we not ignore the context in which the phrase appears in the statute. We have held that "when context suggests that a group of words have something in common, each word should be ascribed a meaning that is consistent with its accompanying words." *State v. Rick*, 835 N.W.2d 478, 485 (Minn. 2013) (applying the associated-words canon to interpret the statutory term "transfer" in light of the characteristics of the substances listed in the statute); *see also Wong v. Am. Family Mut. Ins. Co.*, 576 N.W.2d 742, 745 (Minn. 1998) (analyzing the commonalities among a list of objects to interpret a statute prohibiting littering). Because the phrase "dispute resolution process" is followed by four examples of dispute resolution methods, the associated-words canon suggests that when another process suspends the statute of limitations, it is likely to share the characteristics of the listed examples.

With respect to those examples, the suspension provision says that the statute of limitations is suspended when the parties are "voluntarily engaged in a dispute resolution process ... *including arbitration, conciliation, mediation or grievance pro-*

*cedures.*" Minn. Stat. § 363A.28, subd. 3(b) (emphasis added). The term "arbitration" means "[a] dispute-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute." *Arbitration, Black's Law Dictionary, supra.*[3] *Black's Law Dictionary* defines "conciliation" to mean "a process in which a neutral person meets with the parties to a dispute and explores how the dispute might be resolved." *Conciliation, Black's Law Dictionary, supra.* Additionally, "mediation" is defined as: "A method of nonbinding dispute resolution involving a neutral third party who tries to help the disputing parties reach a mutually agreeable solution." *Mediation, Black's Law Dictionary, supra.* Finally, the term "grievance procedure" is defined as "[a] process, consisting of several steps, for the resolution of an employee's complaint.... If the grievance is not resolved at the first step, the grievance is appealed in successive steps that vary among collective-bargaining agreements. The final step of the procedure is grievance arbitration." *Grievance Procedure, Black's Law Dictionary, supra; see also Grievance Arbitration, Black's Law Dictionary, supra* ("Arbitration of an employee's grievance, [usually] relating to an alleged violation of the employee's rights under a collective-bargaining agreement.").

The similarities between the examples suggest that a "dispute resolution process" includes formal processes capable of providing relief to the complainant. The four listed examples all contain elements of formality. In the context of arbitration, conciliation, and mediation, the process clearly starts when the parties begin discussions before the third party and ends when the

---

**3.** Because the examples provided by Minn. Stat. § 363A.28, subd. 3(b), are clearly technical in nature, we rely on the definitions in *Black's Law Dictionary* to help define their characteristics.

parties or the third party reach a decision on the matter. Grievance procedures have a similarly clear beginning and ending. In that context, the process begins with a formal complaint made under a collective bargaining or other agreement and the process concludes when the parties agree or the grievance arbitrator resolves the case.

Moreover, many of the listed examples are often completed under written guidelines or rules. *See, e.g.*, Minn. Stat. §§ 572B.01-.31 (2016) (providing rules for arbitrations completed under an agreement to arbitrate); Minn. Stat. § 572.33, subd. 3 (2016) (defining "agreement to mediate" in the context of the Minnesota Civil Mediation Act to mean "a written agreement which identifies a controversy between the parties to the agreement, states that the parties will seek to resolve the controversy through mediation, provides for termination of mediation upon written notice from either party or the mediator[,] . . . is signed by the parties and mediator and is dated"); *Grievance Arbitration, Black's Law Dictionary, supra* (defining "grievance arbitration" to mean the arbitration of "the employee's rights under a collective-bargaining agreement"). Such a written agreement distinguishes these kinds of processes from informal settlement discussions.

Furthermore, a central tenet of many arbitration, mediation, conciliation, and grievance processes is the use of a third-party neutral to resolve the dispute. Although not a necessary component of these processes, *see, e.g., Grievance Procedure, Black's Law Dictionary, supra* (indicating that arbitration by a third-party neutral is typically the final step in the grievance procedure process), third-party neutrals are often involved at some point in each of the processes. *See Arbitration, Black's Law Dictionary, supra* (defining "arbitra-

tion" to require a third-party neutral); *Mediation, Black's Law Dictionary, supra* (defining "mediation" to require a third-party neutral); *Conciliation, Black's Law Dictionary, supra* (defining "conciliation" to require a third-party neutral). This is one additional sign of formality inherent in the four examples of dispute resolution processes listed in the statute.

In addition to these elements of formality, each process listed in the statute is capable of providing the complainant relief. *See The American Heritage Dictionary of the English Language, supra*, at 1444 (defining "process" to mean "[a] series of actions, changes, or functions bringing about a result"). In arbitration, the arbitrator's conclusion typically resolves the case. *See State v. Berthiaume*, 259 N.W.2d 904, 910 (Minn. 1977) ("[W]ith respect to the issue of the merits of the dispute it is well settled that 'an arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact, including the interpretation of the terms of any contract.'" (footnotes omitted) (quoting *Cournoyer v. Am. Television & Radio Co.*, 249 Minn. 577, 83 N.W.2d 409, 411 (1957))). Grievance procedures also share this finality characteristic, particularly if the parties decide to continue the process until an arbitrator resolves the dispute. *See Grievance Procedure, Black's Law Dictionary, supra.* Conciliation and mediation likewise will resolve a dispute if successful. A successful conciliation process leads to a settlement agreement between the parties that resolves the case before litigation. *See Conciliation, Black's Law Dictionary, supra.* Likewise, a settlement agreement reached through mediation typically binds the parties to their decision. *See* Minn. Stat. § 572.35, subd. 1 (2016); *Haghighi v. Russian-Am. Broad. Co.*, 577 N.W.2d 927, 930 (Minn. 1998) (requiring a mediation agreement to state that it is binding for it to bind the parties,

and suggesting that the purpose of the law is to allow the parties to fully participate in the mediation process without fear that hastily written negotiations will be used against them).[4]

The statute contains other textual clues as to the type of process that would suspend the statute of limitations. Specifically, in addition to providing examples of processes that suspend the statute of limitations, Minn. Stat. § 363A.28, subd. 3(b), requires a potential respondent who participates in a dispute resolution process to notify the Department of Human Rights of the date the process began and when it ends.[5] Additionally, Minn. Stat. § 363A.28, subd. 5, suspends the period of time the Commissioner of the Department of Human Rights has to make a determination of probable cause while the parties are engaged in "mediation or other alternative dispute resolution that has been sanctioned by the commissioner." These provisions suggest that a process that falls under the phrase "dispute resolution process" typically has a clearly identifiable starting and ending date. Otherwise, neither respondents nor the Department of Human Rights would know when to act under the statute.[6]

With these contextual clues in mind, we turn to the City's Workplace Policy to determine whether it qualifies as a "dispute resolution process." The City's Workplace Policy is a formal process with the capacity to resolve Peterson's claims. Similar to the examples provided in the statute, the Workplace Policy is a written document that provides procedures for filing a complaint, and the steps the City will take to resolve the issue. The Workplace Policy requires that when an employee files a complaint under the policy, such complaints "will be taken seriously and investigated. The City will begin an inquiry, even if the complainant does not want an investigation conducted, any action taken, or anyone else informed." The Workplace Policy also directs a supervisor who receives a complaint to "(1) take prompt action to address the complaint; and (2) report the complaint to the department head or designee," who is then required to

4. The dissent argues that dispute resolution processes must also allow the parties to exchange their views on the proper outcome of the dispute. But this assertion is not borne out by the examples listed in Minn. Stat. § 363A.28, subd. 3(b). For instance, in arbitration the parties may simply present their evidence to an arbitrator without exchanging information with the opposing party. AAA Commercial R. 1(a) (2016) (allowing the parties to vary arbitration procedures through mutual agreement). Likewise, in grievance procedures, the parties undergo an investigative process that does not necessarily require the parties to exchange their views. *See Grievance Procedure, Black's Law Dictionary, supra* (describing a process of successive steps conducted according to a collective bargaining agreement, which may vary the procedures).

5. The dissent argues that the Workplace Policy does not require the City to provide notice of its decision to the parties, and so lacks an essential characteristic of a dispute resolution process. The dissent overlooks the letter that Peterson received informing him of the City's decision regarding his complaint. Regardless, Minn. Stat. § 363A.28, subd. 3(b), requires a respondent who participates in a dispute resolution process with a charging party to "notify the department [of human rights] and the charging party in writing of the participation in the process and ... of the ending date of the process." The statute limits the responding party's ability to raise the statute of limitations as a defense if it fails to provide this notification. *Id.*

6. Unlike the specific examples in the statute, informal or non-structured settlement discussions, such as those at issue in *Wussow*, 2012 WL 5199528, typically do not have a clearly identifiable end date. For example, one party may choose to not respond to a settlement offer, but that does not, as an objective matter, show that the negotiations have concluded.

report the complaint to the director of the human resources department. The Workplace Policy also states that a supervisor's failure to enforce the policy may result in a final warning or dismissal.

These express written directives ensure that the complaint process has an objectively verifiable starting and ending date. Under the Workplace Policy, the City is required to take "prompt action" upon receipt of a complaint, even if the complainant would not prefer such action by the City. The Workplace Policy also states that the City will investigate violations of the policy and take appropriate action. The completion of the investigation and the imposition of appropriate discipline, if any, marks the end date of the process under the Workplace Policy.

In addition to having express written procedures for filing and resolving a complaint, the Workplace Policy also involves people somewhat analogous to third parties in the sense that the investigators are people who are not directly involved in the matter giving rise to the complaint. Specifically, when the employee's supervisor receives the employee's complaint, the supervisor is required to report the complaint to "the department head or designee. The department head or designee shall report the complaint to the Director of the Human Resources Department." The director of the human resources department then assigns investigators to investigate the alleged violation of the policy. Although the human resources department and the investigators are all employed by the City, they serve a functionally similar role to third-party neutrals. Rather than have the employee or department against whom the complaint was filed investigate the claim, the Workplace Policy expressly requires that another City office complete the investigation. The investigator serves in a somewhat similar role to an arbitrator in an arbitration in that the investigator takes statements from witnesses and the parties before drawing conclusions as to the facts. The Workplace Policy's use of investigators and an outside department is similar to the way in which the statute's examples use third-party neutrals to resolve claims. Because the Workplace Policy has an objectively verifiable starting and ending date, has express written procedures, and makes use of employees not involved in the dispute to investigate complaints, the Workplace Policy satisfies the level of formality required by the statute.

In addition to being a formal process, the Workplace Policy is capable of providing relief to Peterson. The Workplace Policy expressly requires the person receiving the complaint to "take prompt action to address the complaint" and to report it to the human resources department and does not limit the power of the human resources department or other supervisors to grant relief. Because the Workplace Policy imposes no limits upon the types of relief available, the department had the power, as the City conceded at oral argument, to reinstate Peterson to his former position with the Violent Offender Task Force.[7]

7. The dissent contends that because the Workplace Policy does not specifically list the kinds of relief the City is allowed to provide, the Workplace Policy does not authorize City employees to provide relief to complainants. We disagree. The Workplace Policy mandates that the person receiving the complaint "take prompt action to address the complaint." Although the Workplace Policy does not specifically list the types of relief available, it expressly authorizes employees receiving complaints to take actions to address the complainant's concerns. The fact that this express authorization does not limit the kinds of relief available by listing them does not mean that the authorization does not exist.

For these reasons, we conclude that the City's Workplace Policy possesses the same formality and ability to resolve disputes as the examples listed in the statute. Accordingly, we hold that the City's Workplace Policy is a "dispute resolution process" under Minn. Stat. § 363A.28, subd. 3(b).[8]

## C.

■ Having concluded that the parties were "voluntarily engaged in a dispute resolution process" under Minn. Stat. § 363A.28, subd. 3(b), we next consider whether the dispute resolution process "involv[ed] a claim of unlawful discrimination" under the MHRA. The City interprets the phrase "involving a claim of unlawful discrimination" to require the dispute resolution process to have as its central focus the resolution of disputes under the MHRA. Because the Workplace Policy is focused on improving the workplace environment, the City concludes that the Policy could not "involv[e]" a claim of unlawful discrimination. Peterson, on the other hand, argues that even if the Workplace Policy might cover claims outside the scope of the MHRA, he brought his age-related claim under the Workplace Policy and his claim was within the scope of the MHRA. Therefore, Peterson concludes, the Workplace Policy is a dispute resolution process involving a claim of unlawful discrimination under the MHRA. We agree with Peterson.

■ The plain meaning of "involving" shows that the process involved a claim under the MHRA. The term "involving" means "[t]o contain as a part; include." *The American Heritage Dictionary of the English Language, supra,* at 950. Thus, a dispute resolution process that includes or contains a claim under the MHRA involves a claim under the MHRA. The parties agree that Peterson's complaint alleged that the City discriminated against him because of his age when it transferred him to another department. Adverse employment actions based upon age fall within the scope of the MHRA, Minn. Stat. § 363A.08, subd. 2, and therefore, Peterson's complaint under the Workplace Policy "involv[ed] a claim of unlawful discrimination" under the MHRA.

Because Peterson and the City were "voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination" under the MHRA,[9] the statute of limitations was suspended for the duration of this process.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

## DISSENT

ANDERSON, Justice (dissenting).

I respectfully dissent. The plain language of Minn. Stat. § 363A.28, subd. 3(b) (2016), requires that the parties be en-

---

8. In relying on these characteristics here, we do not mean to suggest that all of these characteristics must exist before the policy at issue can be a dispute resolution process under the statute or that these are the only characteristics that would be relevant to the analysis. But these characteristics are sufficient to conclude that the Workplace Policy is a dispute resolution process.

9. Peterson additionally argues that the district court improperly granted summary judgment for the City because there was a genuine dispute of material fact regarding whether the City's Workplace Policy culminated in mediation. Because we conclude that the parties "voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination under" the MHRA, we need not address this issue.

gaged in a "dispute resolution process" to suspend the statute of limitations for a claim of unlawful discrimination under the Minnesota Human Rights Act (MHRA). Because the City of Minneapolis's Respect in the Workplace Policy is not a dispute resolution process and the complainant was unable to engage in the Workplace Policy investigation, the statute of limitations here was not suspended under the statute, the complaint was not timely filed, and I would accordingly reverse the decision of the court of appeals.

I turn first to the language of the suspension statute, which suspends the limitations period in the MHRA during the period in which the parties "are voluntarily engaged in a dispute resolution process involving a claim of unlawful discrimination under [the MHRA], including arbitration, conciliation, mediation or grievance procedures." Minn. Stat. § 363A.28, subd. 3(b). As the court notes, the phrase "dispute resolution process" must be read in light of the surrounding examples under the associated-words canon. *See State v. Rick*, 835 N.W.2d 478, 485 (Minn. 2013).

I agree with the court that, in this context, the subsequent examples of "arbitration, conciliation, mediation or grievance procedures," Minn. Stat. § 363A.28, subd. 3(b), often use third-party neutrals and always provide a possibility of recovery for the complainant. But the examples of dispute resolution processes also suggest two additional characteristics that are missing here: notice to the employee about the outcome of the process and a process that allows the parties to exchange their respective positions regarding the dispute and the appropriate resolution. *See Arbitration, Black's Law Dictionary* (10th ed.

2014) (describing a mutually agreed upon process where a third-party arbitrator informs the parties of the binding outcome of the case); *Conciliation, Black's Law Dictionary, supra* (describing a process where the parties meet with a neutral person and explore how the dispute might be resolved); *Mediation, Black's Law Dictionary, supra* (describing a process where the parties meet with a neutral third party who tries to help achieve a resolution); *Grievance Procedure, Black's Law Dictionary, supra* (describing a series of successive steps an employer and employee take, typically culminating in a form of arbitration before a neutral arbitrator).

The Workplace Policy does not contain any of these four elements.[1] First, contrary to the court's analysis, the Workplace Policy does not utilize third parties or provide a mechanism for a neutral evaluation of a complainant's claims. The investigators identified by the policy are City employees who investigate claims against other City employees. Because they investigate alleged misconduct within their own organization, these investigators are not neutral third parties. Additionally, the Workplace Policy is focused on finding and prosecuting wrongful conduct, rather than simply helping the parties reach a mutually agreeable resolution to their dispute. The Workplace Policy states that it "is in the best interests of the City to provide a hospitable and respectful workplace." The policy also notes that "[a] person who has knowledge or believes harassment has occurred, or is occurring, is encouraged to report that." Complaints can be filed by anyone, and the City is required to investigate even if the person who complained, or was the target of the

---

1. Importantly, the Workplace Policy never claims to be a dispute resolution policy. Rather, the Policy outlines the procedures for filing a complaint of unlawful discrimination with the City and provides the steps the City will take to determine whether a claim has merit.

alleged misconduct, "does not want an investigation conducted." Supervisors also are subject to strict penalties if they do not enforce the policy, creating an incentive for the supervisors to overreport misconduct. For example, a supervisor's failure to enforce the policy could lead to a "final warning or dismissal for the first offense." My point here is not to argue that the City should have a different policy or that the current policy is unfair or not sufficiently neutral for its purposes. Rather, these elements suggest that the City has chosen an investigatory and prosecutorial model to uncover and prevent harassment, not a model that neutrally investigates claims or attempts to reach a mutually agreeable outcome on the dispute.

Second, the Workplace Policy does not provide for relief or recovery on the part of the complaining employee. The Workplace Policy does not specifically empower the City or its employees to resolve disputes. The Workplace Policy requires the employee receiving the complaint to take "prompt action to address the complaint" and to report it to the director of the human resources department, beginning an inquiry by the City. The court argues that the requirement that the employee receiving the complaint "take prompt action" grants that employee the power to resolve the dispute in any appropriate manner. The problem with this argument is that, at least in the context of this case, this power comes from the employer-employee relationship, not from the Workplace Policy. Put another way, in

the absence of the Workplace Policy, an employee still could complain about discriminatory conduct and the employer still could try to find an accommodation between the employees or take other appropriate action. But as drafted, the Workplace Policy is not what empowers the investigating employee to grant such relief. The only thing the Workplace Policy accomplishes is to authorize another City employee to conduct an investigation.

Third, unlike the statutory examples, the Workplace Policy does not require notice to the employee after the dispute is resolved. In arbitration, conciliation, mediation, and grievance procedures, the parties receive notice when the process has concluded and know the outcome reached. Here, however, the City is under no obligation to inform complainants of the results of its investigation. The Workplace Policy states that "[i]nvestigations ... will be conducted" and that "employees are directed to cooperate." The absence of a notice requirement suggests that the Workplace Policy is meant for the City's benefit, to allow it to investigate claims to determine their validity before taking action. This is something very different from the statutory examples, which are designed to help the parties reach a mutually agreeable solution to a problem, all of which contemplate initial agreement between parties and thus notice of the results (in the case of mediation or conciliation), or formal notice of fact-finding and an award of relief (as in arbitration or grievance procedures).[2]

---

**2.** The court argues that the statutory requirement that the respondent notify the charging party and the Department of Human Rights of its involvement in a dispute resolution process obviates the need for notice. However, this argument begs the question by assuming that processes without notice can be dispute resolution processes. The examples provided in the statute suggest otherwise. Additionally, even though Peterson received a letter describing the outcome of the Workplace Policy investigation, this letter was not required by the terms of the policy itself, suggesting that the letter may have been sent under some other City policy.

Finally, the Workplace Policy does not provide a process for the parties to exchange their respective positions on the dispute or its resolution. The Workplace Policy outlines the process for filing and investigating a complaint, but has no mechanism for the parties to exchange their views on the dispute. Thus, the process is not similar to the structured processes of arbitration, conciliation, mediation, or grievance procedures, which have, at their core, a process for exchanging views on the dispute.[3]

The statutory phrase "are voluntarily engaged in a dispute resolution process," Minn. Stat. § 363A.28, subd. 3(b), supports this final point. The court correctly defines the phrase "are ... engaged" to mean "[t]o involve oneself or become occupied; participate: *engage in conversation.*" *The American Heritage Dictionary of the English Language* 610 (3d ed. 1996). But contrary to the court's interpretation, this definition requires a party to do more than merely initiate a process. For example, two people do not engage in conversation by simply exchanging formulaic greetings; the definition requires a more in-depth exchange. Rather, the statute's use of the word "are" in the phrase "are voluntarily engaged in" indicates a continuing, ongoing process. *See* Minn. Stat. § 363A.28, subd. 3(b). This is further supported by the statute's use of examples that describe a continuing engagement by both sides. Read as a whole, this phrase requires both parties to voluntarily participate in an ongoing process of engagement.

Although the City's Workplace Policy allows complainants to initiate an investigation, it does not allow complainants to freely participate in that investigation. The Workplace Policy sets out a unilateral investigative process that requires no input from the complainant. Even if the complainant initiates the process by filing a complaint, the complainant has no control over how the City investigates the claim, and may not even stop the investigation by withdrawing the complaint. Furthermore, the complainant has neither control over who the City interviews during the course of the investigation nor an express right to attend or otherwise participate in any aspect of the investigation. Although Peterson certainly initiated the investigation, he could not have "engaged" in the investigation, given the limitations in the Workplace Policy itself.

The court's interpretation of the statute broadens the scope of the suspension provision. The court's interpretation requires

---

**3.** The court claims that it is possible for the parties to complete an arbitration process or grievance procedure without exchanging their views on the resolution of the case. This may be possible in rare instances, but the overarching characteristic of the statutory examples is an exchange of views by the parties on the proper resolution of a dispute through some formal process. Although arbitration and grievance procedures, by design, lack the formal discovery machinery of our civil procedural rules, it is difficult to imagine either allowing the parties to proceed without the disclosure of at least the general nature of their claims and defenses. Indeed, standard American Arbitration Association rules contemplate such disclosure. *See, e.g.,* AAA Commercial R. 32(a) (2016) ("The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense."). Those rules also provide for a statement of claim (including the relief sought), an answer, and an arbitrator-managed document exchange. AAA Commercial R. 4(e)(iv), 5, 22(b). I recognize that many arbitration and grievance hearings are very informal and may well prove to be more informal than the rules provide. But the Workplace Policy is completely different from the listed examples because it provides *no* mechanism for an exchange of claims and defenses and provides *no* mechanism for even requesting such an exchange. The essential characteristics of a dispute resolution process are simply absent from the Workplace Policy.

only that the process be written down, have clearly identifiable starting and ending dates, utilize employees that are not within the same department as the complainant, and not prevent the employer from settling the dispute with the complainant. These elements do not accurately reflect the essential characteristics of a dispute resolution process, nor does the Workplace Policy resemble any of the examples listed. Because the Workplace Policy is not a "dispute resolution process" under Minn. Stat. § 363A.28, subd. 3(b), and Peterson could not have "engaged" in the process even if it were, I would reverse the decision of the court of appeals and affirm the district court's grant of partial summary judgment for the City.

STRAS, Justice (dissenting).

I join in the dissent of Justice Anderson.