CITY OF BROOKLYN CENTER,
Minnesota, Appellant,

v.

LAW ENFORCEMENT LABOR
SERVICES, INC.,
Respondent.

No. C5–01–414.

Court of Appeals of Minnesota.

Oct. 16, 2001.

Review Denied Dec. 11, 2001.

Clifford M. Greene, William J. Otteson, Greene Espel, P.L.L.P., Minneapolis, MN, for appellant.

---

Gregg M. Corwin, Jennifer J. Duchscherer, Gregg M. Corwin & Associates Law Office, P.C., St. Louis Park, MN, for respondent.

Peter A.C. Ivy, Carver, MN, for amicus curiae Minnesota Chiefs of Police Association.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Bruce G. Jones, Faegre & Benson LLP, Minneapolis, MN; and Elizabeth J. Richards, Battered Women's Legal Advocacy Project, Minneapolis, MN, for amici curiae Battered Women's Legal Advocacy Project, Chrysalis—A Center for Women, Minnesota Coalition Against Sexual Assault, and Minnesota Coalition for Battered Women.

Marylee A. Abrams, St. Paul, MN, for amicus curiae Minnesota Police and Peace Officers Association.

Considered and decided by SHUMAKER, Presiding Judge, HALBROOKS, Judge, and PARKER, Judge.*

**OPINION**

GORDON W. SHUMAKER, Judge

Through his union, Law Enforcement Legal Services, Inc. (LELS), John R. Barlow filed a grievance as to the City of Brooklyn Center's decision to terminate him and the matter was submitted to arbitration. The arbitrator reinstated Barlow and the city moved that the district court vacate the award. The district court denied the city's motion. The city appeals, contending that the arbitrator's award should be vacated based on the "public

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

policy exception." In the alternative, the city argues that the arbitrator exceeded his powers. We reverse and remand.

## FACTS

John R. Barlow began working as a police officer for appellant City of Brooklyn Center in 1988. Throughout his employment, until 1991, his job-performance evaluations were favorable and he received letters of commendation.

In 1993, a female employee of the Brooklyn Center police department filed a complaint against Barlow with the Hennepin County sheriff, alleging that Barlow committed criminal sexual conduct against her. The county attorney declined to prosecute because the complainant's report was untimely and the criminal statute of limitations had expired. Nevertheless, Brooklyn Center fired Barlow. As a member of a collective bargaining unit, respondent LELS, Barlow demanded arbitration.

At an arbitration hearing in 1994, the complaining employee testified that she had dated Barlow for six months but ended the relationship in 1989 when she became engaged to another man. She testified that she clearly informed Barlow that she wanted only a professional relationship with him, but that he ignored her desire and propositioned her in the workplace. She stated that twice in the workplace Barlow came up from behind her and touched her breasts, and that he pulled her car over with his squad car so that he could ask if she would let him look down her shirt. The arbitrator made no express findings as to the truthfulness of the allegations but determined that Barlow was entitled to reinstatement as a police officer.

Following his reinstatement, Barlow attended a four-hour training session on Brooklyn Center's sexual harassment policy. He received a written copy of that policy, which prohibits sexual harassment against members of the public as well as against city employees. Among the examples of sexual harassment described in the policy are "unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact, and other verbal, visual or physical conduct of a sexual nature."

On September 29, 1997, a member of the public, Amanda Miller, filed a complaint against Barlow with the Brooklyn Center police department. She accused him of harassing and stalking her. The city placed Barlow on home assignment pending an investigation. The Brooklyn Center police chief then held a televised press conference during which he showed Barlow's photograph and asked that anyone with complaints against Barlow contact the police department. In response, a number of women called the department to complain about Barlow's behavior toward them.

Hennepin County prosecuted Barlow on Amanda Miller's complaint, but a jury found him not guilty on March 27, 1998. The county attorney declined to prosecute any of the complaints from the women who called in response to the police chief's request, explaining that "a large portion of these activities are beyond the seven year statute of limitations period."

After Barlow's acquittal, Brooklyn Center conducted an internal investigation of Barlow's conduct. During the investigation the city obtained from its police department records containing complaints against Barlow by more than 30 women. The city then hired an independent investigator to inquire into the complaints.

The independent investigator interviewed 11 of the complainants and found that the women "did not know one another, did not appear to have overlapping work places or social lives, did not gather

to compare their stories, and had very little to gain by coming forward." The investigator concluded that Barlow had demonstrated patterns of improper conduct, including

- regularly meeting young women in the routine course of working, and later returning, while on duty and in uniform, to arrange dates;
- conducting traffic stops of young women, which resulted in neither the issuance of a citation nor a warning, apparently for the sole purpose of gathering personal information about the young women or for making personal comments to facilitate potential social relationships;
- repeatedly visiting local businesses, while on duty and in uniform, for excessive periods of time for the purpose of watching and talking to young women;
- driving Brooklyn Center Police squad cars to visit the homes (both within and outside of the city's jurisdiction) of young women he was either dating or trying to persuade to date him;
- demonstrating unwanted persistence in placing telephone calls or approaching young women he was trying to date;
- following women, often while he was in uniform and in a Brooklyn Center squad car, for no apparent reason and in a manner that frightened the women he was following;
- repeatedly stating that he needed to know everything about the young women he was trying to date, or, in the alternative, saying that he could find out everything about them;
- describing the interiors or exteriors of the women's homes, even though he had never been invited to the residences;

- belittling the boyfriends or significant others of women he was trying to date;
- making sexually suggestive comments to women he encountered on duty;
- running license plate numbers for his personal use of women he wanted to date;
- using his position as a police officer to gather personal information to be used to further his social life;
- using his influence as a police officer (through showing his badge) to gain entrance into nightclubs to check for under-aged women;
- acting in a sexually aggressive manner while on duty;
- intimidating women who confronted him about unwanted telephone calls;
- maintaining that he wanted women he met while on duty to bear his children; and
- purchasing alcohol for minors.

Upon this report, the police chief recommended that the city fire Barlow, stating that Barlow's continued employment as a police officer would compromise public confidence in the police department and would impair the city's efforts to prosecute crimes in which Barlow testifies. Brooklyn Center accepted the recommendation and terminated Barlow on November 16, 1999.

Barlow filed a grievance through LELS and the union demanded arbitration. Fifteen women who had complained about Barlow testified at the arbitration hearing. The arbitrator found some claims to be stale but made findings of fact as to other claims, including the following:

- on two or three occasions in 1990, Barlow followed 19–year–old P.H. home from her school in his squad

car without a valid reason for doing so;

- in 1990, Barlow, while in uniform, visited 20–year–old A.J.P. in a store where she worked, purchased alcoholic beverages for A.J.P. (not knowing her age), and on one occasion took her to a park and began groping her breasts but stopped when she asked him to do so;

- on several occasions in 1991, while in uniform, Barlow stopped at a store in a local mall, asked J.A.R. for dates, and on at least one occasion made disparaging comments about J.A.R.'s boyfriend;

- between 1988 and 1992, Barlow had a few encounters with S.N., obtained her home telephone number by running her license plate numbers without her consent or request, stopped at her house on at least one occasion while in uniform and made a comment that she should not go on dates with other men and that she "should be making beautiful babies" with Barlow;

- in 1997, Barlow took R.C. on an unauthorized ride-along in a squad car, gave her a copy of her driver's record even though she had not asked him to obtain it, and in a phone conversation told her the color of her bathroom tile even though he had never been invited to her home, to her knowledge, conduct which the arbitrator stated "may have" violated criminal law in Minn.Stat. §§ 609.746, subd. 1, 609.749, subd. 1;

- and in 1996 and 1997, Barlow met 18 year old M.O.C. at a store where she worked and persistently asked her on dates while he was in uniform and also pulled her over in his squad car to say hello.

In declining to consider "stale" claims, the arbitrator noted that "[i]t is clear that much of [Barlow's] conduct * * * was predatory and intolerable in a police officer." The arbitrator then commented:

The City is correct in alleging that there is a pattern of conduct by Officer Barlow going back over ten years which is, in aggregate, offensive, inconsistent with a proper public image for Brooklyn Center police officers, and a violation of a host of rules, regulations, statutes, and orders. * * * [T]he City did establish a pattern of inappropriate behavior going back in some cases to 1989.

Nevertheless, the arbitrator concluded that much of alleged conduct was time-barred for disciplinary purposes and that the remaining conduct, while serious, did not warrant outright dismissal. Accordingly, he reinstated Barlow without back pay, noting that the intervening period would effectively serve as a very long suspension, which would constitute appropriate discipline commensurate with the seriousness of Barlow's conduct.

Brooklyn Center moved in district court to vacate the arbitrator's award, alleging that the award was against public policy and that the arbitrator exceeded his powers. The district court denied the city's motion and confirmed the arbitrator's decision.

## ISSUE

Despite finding that a terminated municipal police officer had engaged in a pattern of offensive and predatory conduct toward women for over ten years, an arbitrator awarded to the officer reinstatement of his law enforcement employment. In view of the general rule that arbitration awards within the arbitrator's power are to be upheld on appeal, does the "public policy exception" to that rule require the vacation of the award?

## ANALYSIS

■ While acknowledging that an award that is within an arbitrator's power is ordinarily to be upheld on appeal, Brooklyn Center, and amici curiae Battered Women's Legal Advocacy Project et al., Minnesota Chiefs of Police Association, and League of Minnesota Cities, argue that the "public policy exception" to the general rule regarding arbitration awards requires that this award be vacated.

■ Arbitration is a proceeding favored in the law. *Ehlert v. W. Nat'l Mut. Ins. Co.*, 296 Minn. 195, 199, 207 N.W.2d 334, 336 (1973). It is settled law that

an arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact, including the interpretation of the terms of any contract, and his award will not be reviewed or set aside for mistake of either law of fact in the absence of fraud, mistake in applying his own theory, misconduct, or other disregard of duty.

*Cournoyer v. Am. Television & Radio Co.*, 249 Minn. 577, 580, 83 N.W.2d 409, 411 (1957) (footnotes omitted).

■ "As with any contract, however, a court may not enforce a collective-bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Thus, "[in] limited circumstances, a 'public policy exception' may provide a basis for courts to vacate an arbitration award." *City of Minneapolis v. Police* Officers' Fed'n, 566 N.W.2d 83, 89 (Minn.App.1997) (citations omitted). The public policy doctrine

derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the

observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements.

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (citations omitted).

■ The question of public policy is ultimately one for resolution by the courts, *W.R Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183, and therefore we need not show deference to the district court's conclusion. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Commn.*, 358 N.W.2d 639, 642 (Minn.1984) (reviewing court not bound by and need not give deference to district court's decision on purely legal issue).

■ To be applicable, the public policy exception must involve a policy that is

well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

*W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183 (citation and quotation marks omitted), *quoted in State, Office of State Auditor v. Minnesota Ass'n of Prof'l Employees*, 504 N.W.2d 751, 756 (Minn.1993). The public policy exception is therefore narrowly defined, and a court may set aside an arbitration award only if (1) the labor agreement contains terms which violate public policy, or (2) the arbitration award creates an explicit conflict with other laws and legal precedents. *State Auditor*, 504 N.W.2d at 756.

Thus, the relevant inquiry is not whether Barlow's conduct violated some public policy but rather whether the arbitrator's decision to reinstate Barlow violates public

policy. *See id.* at 757 ("[W]hile [the terminated employee's] *conduct* would appear to violate a well-defined and dominant public policy * * * we cannot automatically conclude that the arbitrator's *award* reinstating [the employee] violates that public policy."); *see also E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62–63, 121 S.Ct. 462, 467, 148 L.Ed.2d 354 (2000) ("[O]f course, the question to be answered is not whether [the discharged employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so."). In effect, we must analyze the matter as though the labor agreement contractually calls for Barlow's reinstatement. *See id.* at 62, 121 S.Ct. at 466–67.

The arbitrator's authority is defined by the labor agreement and his decision must be based on the agreement:

> The decision shall be binding on both the EMPLOYER and the UNION and shall be based solely on the arbitrator's interpretation or application of the express terms of this AGREEMENT and to the facts of the grievance presented.

It is indisputable that Minnesota's public policy proscribes invasion of privacy, stalking, harassment, and sexual harassment. Minn.Stat. § 609.746, subd. 1 (2000), classifies as a misdemeanor acts of gazing or peeping into someone's home with the intent to interfere with an occupant's privacy. Stalking and harassing are also misdemeanors. Minn.Stat. § 609.749, subd. 2 (2000). And Minnesota's Human Rights Act prohibits sexual harassment that results in the denial of the use or benefit of a public service to a person because of the person's sex. Minn.Stat. § 363.03, subd. 4 (2000). The arbitrator's findings support the conclusion that Barlow violated all these laws. Such violations would also constitute violations of public policy. But the dispositive question is whether the ar-

bitrator's decision, which was a product of the interpretation and application of the labor agreement, violates public policy.

█ In answering this question, we first note that there exists in Minnesota a well-defined and dominant public policy that imposes upon governmental units an affirmative duty to take action to prevent and to sanction sexual harassment and sexual misconduct by law enforcement officers. For instance, administrative rules governing the licensing of peace officers allow for disciplinary action—including revocation of a license—against licensees who "engag[e] in sexual harassment, as defined by Minnesota Statutes, section 363.01, subdivision 41." Minn. R. 6700.1600(N); 6700.1710, subp. 2 (1999). Further, under 42 U.S.C. § 1983 (1994), a municipality that fails to take remedial action after having learned of repeated incidents of misconduct committed by a police officer may be deemed to have been deliberately indifferent to such misconduct and therefore liable to a victim. *Harris v. City of Pagedale*, 821 F.2d 499, 506 (8th Cir.1987) ("[T]here was a pattern of sexual misconduct by City police officers * * * that on repeated occasions City officials in positions of authority and responsibility were notified of the offensive acts, but that upon receiving such notice, these City officials repeatedly failed to take any remedial action. * * * [T]his amounts to deliberate indifference to police abuses * * * [and the plaintiff] has proved the existence of a municipal custom sufficient to support municipal liability under § 1983."). Hence, state and federal public policies dictate that state agencies and municipalities have a legal duty to take affirmative remedial steps in order to prevent police officers from engaging in sexual harassment, particularly where the offender has been shown to have engaged in a pattern of such misconduct.

█ It is also significant that a municipality is an employer charged with the duty to prevent sexual harassment in the workplace. Both Title VII of the Civil Rights Act of 1964 and the MHRA prohibit employers—including states and political subdivisions—from engaging in sexual harassment. 42 U.S.C. §§ 2000e(a), (b); 2000e-2(a) (1994); Minn.Stat. §§ 363.01, subds. 17, 28; 363.03, subd. 1(2) (2000). Title VII dictates that if an employer should have anticipated that an employee would become the victim of sexual harassment in the workplace and yet failed to take action reasonably calculated to prevent such harassment, liability for the harassment may be imputed to the employer. *Johns v. Harborage I, Ltd.,* 585 N.W.2d 853, 862 (Minn.App.1998); *see also* 29 C.F.R. § 1604.11(d) (2000). Accordingly, an employer has an affirmative duty to take action reasonably calculated to prevent sexual harassment in the workplace, particularly from employees who have committed acts of sexual harassment in the past. *See, e.g., Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998) ("The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective.").

We must consider whether Barlow's reinstatement, which is the result of the arbitrator's interpretation of the labor agreement, violates or interferes with the public policies requiring affirmative steps to prevent sexual harassment.

Several federal appellate courts have examined this issue, reaching ostensibly fact-specific mixed results. *Compare Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters,* 969 F.2d 1436, 1441–42 (3d Cir.1992) (upholding district court's vacation of arbitration award on public-policy grounds where arbitrator made no finding as to whether alleged sexual harassment actually occurred), *and Newsday, Inc. v. Long Island Typographical Union,* 915 F.2d 840, 844–45 (2d Cir.1990) (overturning on public-policy grounds arbitrator's reinstatement of employee who had engaged in repeated acts of sexual harassment), *with Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am.,* 959 F.2d 685, 687–89 (7th Cir.1992) (declining to overturn on public-policy grounds arbitrator's decision to reinstate employee who had committed acts of sexual harassment), *and Communication Workers of Am. v. S.E. Elec. Coop.,* 882 F.2d 467, 468–70 (10th Cir.1989) (same). *See generally* Andrew M. Campbell, Annotation, *Vacating on Public Policy Grounds Arbitration Awards Reinstating Discharged Employees,* 142 A.L.R. Fed. 387 (West 1997 & Supp.2000).

The federal cases are distinguishable from one another in various respects, but they seem to provide a consistent result: where there have been prior offenses and warnings, the public policy exception may be invoked. But when there have been no prior offenses or warnings the exception may not be invoked. In *Newsday,* the discharged employee had been disciplined in the past for sexual harassment in the workplace, yet continued to exhibit similar behavior for which he was ultimately terminated. The court upheld the district court's vacation of the arbitrator's reinstatement, observing that the employee had "ignored repeated warnings" and prevented the employer "from carrying out its legal duty to eliminate sexual harassment in the work place." *Newsday,* 915 F.2d at 845. In both *Chrysler Motors,* 959 F.2d at 688, and *Communication Workers,* 882 F.2d at 469–70, on the other hand, the discharged employees had received no

warnings in the past or had an otherwise exemplary work records unmarred by any incidents of past sexual harassment. Perhaps prior warnings and offenses, or lack thereof, are among the many factors that have been persuasive in the federal courts in cases raising the public policy exception.

Recognizing the strong and clear public policy against sexual harassment, the affirmative duty of employers to implement that policy, and the unique opportunity of a police officer with a lengthy history of violations of that policy to continue to commit similar violations, we hold that the arbitrator's decision under the extreme facts of this case violated public policy and must be vacated.

We believe that the public policy exception to the general rule of upholding arbitration awards compels this result. Although arbitration awards are to be respected as being the product of the contractual agreements of the parties, in extreme and unique cases, such as this, public policy must be given precedence. Barlow has repeatedly demonstrated a willingness to engage in sexual harassment despite attempted employment termination and a criminal prosecution. He violates the law with apparent impunity and perhaps will be even more resolute in his misconduct if his reinstatement is allowed. To allow Barlow to continue to work as a police officer for Brooklyn Center is tantamount to exempting the city from its duty to enforce its own policy and the public policy against sexual harassment. We, therefore, reverse the district court's order confirming the arbitrator's award and remand with instructions to vacate that award.

LELS offers a dire prediction that the vacation of the arbitrator's award will undermine the arbitration process and will "open the floodgates" to litigation challenging arbitration awards. We have already noted that this is an exceptional case, involving protracted outrageous behavior by a person granted special powers and who is held out by his employer as a person whom the public can trust, and who has unique opportunities to engage in misconduct. Our decision does not threaten the general rule regarding arbitration awards, nor do we intend that. But the proper discharge of the court's duty requires that it avoid a merely perfunctory approach to appeals of orders confirming arbitration awards.

Finally, because this award must be vacated upon an application of the public policy exception, we need not reach Brooklyn Center's second contention that the arbitrator exceeded his powers.

### DECISION

The district court erred in declining to vacate the arbitrator's award.

**Reversed and remanded.**