CONNOLLY, Judge
Appellant City of Richfield terminated a police officer after an internal investigation concluded that the officer (1) used excessive force during an encounter on October 3, 2015, (2) failed to report this use of force, and (3) violated his training and the standards of conduct expected of a Richfield police officer. The officer filed a grievance through his union, respondent Law Enforcement Labor Services Inc. (the union), and the matter was submitted to arbitration. The arbitrator found that the officer was fired without cause and directed that he be reinstated to his position and made whole, less three days of unpaid suspension. The city filed a motion to vacate the arbitration award, which the district court denied. The city appeals, arguing that the arbitration award should be vacated based on the public-policy exception. We agree and reverse.
FACTS
Nathan Kinsey was hired as a police officer at the Richfield Police Department (RPD) in February 2006. In March 2012, he became one of two canine officers with a new special assignment. On October 3, 2015, at around 6:15 p.m., a Richfield resident reported that "more than 50 Somalis" were gathered in a park and "driving crazy on the roads." Kinsey's K-9 squad and another officer (Officer 2) in a separate squad car were dispatched to the park.
As Kinsey approached the park, he had to brake sharply to avoid a collision with two vehicles coming from the other direction. Kinsey pulled these vehicles over, and Kinsey's squad video camera and synced microphone automatically activated at 6:30 p.m. The first driver, D1, was a nearly 20-year-old Somali male with three passengers in his vehicle. The second driver, D2, was a nearly 16-year-old Somali male with one passenger in his vehicle. Kinsey told D1 that he had been called because "you guys were driving like idiots."
*468 Neither driver was able to produce a driver's license or proof of insurance. D1 claimed that his license was at home, and D2 claimed that he had a permit that was not with him. Kinsey warned the drivers that without proof of insurance, their cars would be towed. Both drivers used their phones to try to find their insurance information.
Instead of responding to Kinsey about his license and proof of insurance, D2 was argumentative about whether he was driving too fast or following too closely. After talking with D2 and the passenger in his vehicle for about six minutes, Kinsey said, "Jesus Christ, you guys ever tell the f- - -ing truth one day in your life ... if you can't prove the insurance, I'm towing the car, ok, so f- - -ing find it."
Kinsey returned to D1 and asked him, as well as his vehicle passengers, who had been in the park. They responded that none of them had been in the park, and Kinsey said, "Jesus Christ you guys are so full of s- -t I can't believe it." Kinsey called dispatch to get the drivers' licenses and to report the driving violations. Kinsey told dispatch, "they are all lying" about why they are here and whether they were in the park. Kinsey learned that D2's permit had been revoked. He returned to D2 and told him that he could not be driving and he needed to find a licensed driver.
Kinsey returned to D1 and gave him a careless driving ticket "for nearly causing an accident." When D1 said he was concerned this would go on his license, Kinsey said, "don't drive like an idiot." D1 responded, "I wasn't driving like an idiot." Kinsey said,
I watched you nearly cause an accident because you were speeding around a corner. The time for arguing is done. You want to take it to court and we can talk about it in front of a judge ... but we are not going to discuss it anymore. You can carefully drive away from here ok I don't want to see you back in the [c]ity again. I should be towing your car.
D1 argued about being excluded from the city, and Kinsey replied, "not tonight." D1 said he had cousins who lived there, and Kinsey told him and his passengers to get out of the car because it was going to be towed. D1 argued again, and Kinsey said:
For careless driving I can tow your car[.] I am giving you a break[.] I'm saying I don't want to see you again tonight driving around my [c]ity like an idiot. OK, it does not require an argument it requires a yes sir and drive away carefully. Can you do that?
Kinsey returned to D2 to get his mother's name for the ticket. D2 again asked why he was pulled over. While Kinsey was trying to get information from D2, D2 was talking to his mother on the phone, giving her directions to come get him. D2 said one of the three young men sitting on the curb, monitored by Officer 2, was a licensed driver who could drive his car. D2 said he could not get his insurance information because his internet was too slow. Kinsey told him to figure it out or the car would be towed.
At this point, two and a half minutes had passed since Kinsey told D1 to drive away, but D1 had not moved. Kinsey returned to D1 and said, "You need to leave now ok, drive around my squad car, it's time to go." The vehicle moved away, and Kinsey put his squad car closer to D2. Kinsey exited his car and saw D1 and his passengers approaching on foot. As Kinsey walked toward D2's vehicle, Kinsey said, "Hey I thought that you weren't coming to the park ... you didn't know anything about the park." Kinsey then muttered, "You guys never told the f- - -ing truth ever in your life, none of you f- - -ers." Kinsey then asked D2 for proof of insurance, *469 asked how long until his mother would arrive, and asked which guy on the curb was a licensed driver.
Kinsey then started walking the approximately 50-foot distance to where D1 and his passengers were, about 15 feet from Kinsey's squad car. The following conversation ensued:
Kinsey: Thought you didn't know anything about the park and were just driving around.
D1: Well you just gave me a ticket that is going to go on my license.
Kinsey: Oh I'm sorry. Don't drive like an a- -hole and you won't get tickets.
D1: (unintelligible).
Kinsey: Don't blame me, blame yourself.
D1: I'm not blaming you, I'm just saying (unintelligible).
Kinsey: Oh you gave me a ticket and it's going on my insurance. Tough s- -t. Don't drive like an a- -hole.
D1: I am just saying that you gave me a ticket (unintelligible).
Kinsey: You're right I did. You're lucky I didn't tow your car too.
D1: What are you going to tow my car for? What did I do, man?
Kinsey: Careless driving. Do I need to explain it again?
At this point, D2 began to record the exchange on his cellphone. This 36-second video shows Kinsey and D1 on the grass near the street. D1 is several feet behind his group with a cellphone to his left ear as the group is headed down the path toward the park. D1 is facing the path. Kinsey is facing D1's right side. The video shows Kinsey and D1 talking and Kinsey pointing down the street toward the corner where D1's car had gone.
D1: Where is my car now?
Kinsey: I'm guessing around the corner. It's not going to take that much to figure it out.
D1 (on cell): (unintelligible) yeah hello.
Kinsey: Move along.
While D1 is standing still, Kinsey is talking and repeatedly pointing in the direction toward the park. Kinsey's voice gets louder as he repeatedly tells D1 to move along.
D1 (on cell): This b- - -h a- - cop just gave me a ticket, man.
Kinsey: Move along. Keep running your mouth, it's going to get worse. Move along.
D1: He gave me a ticket for some f- - -ing whatchamacallit.
D1 moves a few small steps forward then stops. Kinsey points again and says "move along." Kinsey then uses his left hand to push D1's right shoulder blade. D1 stumbles three or four steps forward, somewhat downhill, stops and turns slightly toward Kinsey.
D1: Quit pushing me (?) (unintelligible).
Kinsey: Then move when I tell you to.
D1: (unintelligible) I will move. This is a public place (unintelligible).
Kinsey: And we are working right here, now f- - -ing move.
D1: I'm talking to my (brother? unintelligible) to pick up the car.
Kinsey then approaches D1, points with his right hand, and slaps D1's head with his left hand, causing D1's head to jerk forward. Kinsey then shoves D1's back again, causing D1 to stumble a few steps forward, down the hill. The video ends. Kinsey's microphone picks up the following:
Kinsey: Move now. Move now, go!
D1: Are you kidding me?
Kinsey: Get the f- - - out of here.
*470 There was commotion from the group, then Kinsey said, "Do you all want to go? I'll f- - -every one of you f- - -ers up, move along we're working here."[1]
Officer 2 moved closer to where Kinsey was and helped move the group down the path toward the park. Kinsey then returned to D2 and "calmly inquired about his mother's location." D1's group lingered near the top of the path. One voice said something about having "got [Kinsey] on video." Kinsey again told the group to "move along." The group slowly moved toward the park, and one voice said, "Let's go."
Kinsey: You cannot stay here when we're trying to work. We told you to move along, now go, stop standing here and talking and go, every one of you, go!
D1: You can't f- - -ing hit me though, all right n- - -a, you got some anger issues.
Unidentified: We got you on camera.
Kinsey returned to D2 and asked what kind of car his mother drove. Neighbors who were concerned about the large gathering and the driving approached. Kinsey said the group had the right to hang out in the park and to call again if any troublesome conduct occurred. Kinsey returned to D2, noticed he had Snapchat up on his phone and said, "So you don't have enough internet connection to get on your email, but you can get on Snapchat ... seems a bit backwards."
Approximately seven minutes after D1's group was herded down the path, they began coming back. Officer 2 approached and indicated that they should cross the edge of the park on the other side of the trees to not get close to the traffic stop. Kinsey told D2 to park his car and wait for his mother. He said he was issuing a ticket for driving after revocation and not for the driving conduct, but if he caught D2 driving again that night, he would tow the car. Kinsey told D2 that D2 should have been polite at the start of the encounter because having an attitude makes things worse.
After the encounter, Kinsey asked his sergeant whether a case number[2] was required for a careless-driving citation. He learned it was not, but that he should "put notes in the tag." Kinsey testified that these notes are to help him recall events if he later needs to testify about them. Kinsey wrote brief notes on each citation. On D2's citation, Kinsey wrote, "following car too closely nearly crashed around curve. Driver unable to produce [insurance]. Claimed to have permit. Mother came to drive car." On D1's citation, Kinsey wrote, "Speeding away from [the park] (called here because of this issue). Nearly caused accident due to careless driving ... Pickup truck in front of me had to slam on brakes to avoid collision. All occupants then walked up on me later trying to cause trouble." It is undisputed that Kinsey then finished his shift without reporting the incident or his use of force.
On October 5, 2015, the command staff received inquiries concerning a video on Twitter that showed a Richfield officer shoving and hitting D1. The command staff viewed the video and recognized Kinsey. The Richfield Police Chief (chief) received calls from the media and from the Somali Human Rights Commissioner. Searching *471 for a report only produced the citations, so the command staff could not meaningfully respond to the inquiries.
The chief referred the matter to the Bureau of Criminal Apprehension (BCA) for a criminal investigation. Upon completion, the BCA referred its file to the Office of the Hennepin County Attorney to review for potential felonies. It determined that Kinsey's actions did not constitute terroristic threats because the statute requires a threat to commit a crime of violence with the purpose to terrorize another or in reckless disregard of causing such terror.
A special prosecutor reviewed the file for gross misdemeanor or misdemeanor violations and declined to file any criminal charges. After learning that no criminal charges would be filed, the chief directed a lieutenant to conduct an internal investigation of Kinsey's conduct. The investigator attempted to schedule interviews with six witnesses who had been identified through the BCA investigation. Only D1 responded and was interviewed. The investigator also took statements from Kinsey, Officer 2, and the sergeant leading Kinsey's team. The investigator noted that:
• Before the October 3 incident, Kinsey had been counseled four times since August 3, 2011, including on reporting issues related to use of force.
• In January 2013, Kinsey had received a documented oral reprimand for excessive strikes to the head and lack of details in his report to justify his actions.
• Kinsey was required to go through extensive remedial training on use of force and proper documentation when using force.
• The videos of the October 3 incident show that Kinsey was an angry, easily frustrated officer who continued to use excessive force despite efforts to coach him, remedially train him, and discipline him.
• Kinsey's profane language and demeanor throughout the call is problematic, and his use of excessive force and his failure to report his actions constitute extremely troubling conduct.
• Kinsey's stated concern for how the incident would look on video and his belief that D2's video would be automatically deleted because it was sent on Snapchat are evidence that he was assessing what recordings of his actions existed, to avoid disclosure.
• Kinsey's conduct and deception suggest he is not capable of being trusted to do the right thing when called upon in the field.
• Kinsey's judgment is completely off-base and his escalation of a routine traffic stop to excessive force and failing to report it are extremely problematic.
The investigator sustained the allegations that (1) Kinsey violated his training and the conduct reasonably expected of a Richfield police officer, citing his use of profane and abusive language; (2) Kinsey used excessive force beyond his authority and training, citing the absence of active resistance by D1, his unnecessary and unprofessional level of anger, and contradictions between his statements and his training; and (3) Kinsey failed to properly document or report his contact with D1, citing his knowledge of the required use-of-force reporting procedure, his statement that he considered writing a "CYA" (cover your a- -) report, and the opportunity to inform his sergeant during his shift. The investigator concluded that Kinsey's conduct violated the police department's mission statement, the oath of office, and the following policies: Conduct Unbecoming, *472 General Standards of Conduct, Direction, Employee Speech, Impartial Policing, Special Incident Review, Use of Force, and Liabilities Associated with Use of Force.
Based on the investigator's findings, the chief recommended that the city fire Kinsey. The city discharged Kinsey, effective April 14, 2016. As grounds, the city manager cited substantiated findings of serious violations of RPD policies and procedures. Kinsey, through the union, filed a grievance that the discharge was without just cause. The city manager denied the grievance, and the matter was submitted to arbitration.
Relevant to the issues of excessive force, the arbitrator found:
• After D1's group returned on foot, Kinsey determined its presence was a safety concern because D1 was getting others in the area riled up.
• Kinsey repeatedly told D1 to "move along," while pointing in the direction he wanted D1 to go.
• D1's failure to comply with Kinsey's requests meant Kinsey "needed to choose a method to enforce it."
• Kinsey decided not to arrest D1 for disorderly conduct in an effort not to cause "even more commotion," which was reasonable under the circumstances.
• Kinsey decided the quickest and safest way to gain control and compliance was to shove D1, causing his feet to move in the direction that Kinsey wanted him to go.
• After D1 was defiant again, Kinsey, in a further effort to gain compliance, hit D1 on the back of the head and shoved D1 a second time.
• This contact caused some members of the group to "come at" Kinsey, to which Kinsey responded, "Do you all want to go? I'll f- - - every one of you f- - -ers up, move along, we're working here." Kinsey said this in "an effort to control the situation," and "this effort succeeded."
• The RPD policy on use of force requires officers to "use the minimum force that is reasonably necessary to effectively bring an incident under control, while protecting the life of the officer and/or others."
• The policy does not list what types of non-deadly force techniques are acceptable.
• Training materials state that the amount of force that is objectively reasonable is based on the totality of the circumstances.
• A former RPD use-of-force instructor testified that an open-hand strike "was designed to disorient and gain control of a resistant subject; if properly administered, it causes a fall to the ground; a properly cupped hand strike to the back of the head with follow-through will 'launch' the subject; and this is not what he saw [Kinsey] doing on the video."
• Rather than using his dominant hand to deliver an open-hand strike to hurt, knock down, or disorient D1, Kinsey "deliberately used his left hand with limited force in an upward glancing blow to the upper right part of the back of D1's head."
• D1's injury claims in a recent lawsuit were not proof for arbitration purposes.
• The RPD guidelines specify "that such passive resistance can be addressed with techniques that require placing hands on a subject in ways that cause pain."
• Those listed techniques "would result in at least as much discomfort as a glancing slap to the back of the head *473 or being shoved a few steps with limited force."
• Although Kinsey's techniques were outside his training, shoving is a tactic that is used, and it has not been shown that these techniques are prohibited.
Relevant to the issue of failure to report, the arbitrator found:
• The RPD requires officers to report use of force in a "written report and a Special Incident Report" in the following situations: (1) when a firearm is discharged outside the firing range; (2) when a use of force results in death or injury; (3) when a non-lethal weapon is used on a person; (4) when an officer threatens the use of deadly force; and (5) when any force is used in response to significant resistance.
• For a "Special Incident Report," the form an officer is required to fill out, sometimes called a "salmon sheet," lists under an officer's response to "significant resistance": Taser, mace, baton, canine apprehension, threatened use of deadly weapon, and use of deadly force.
• "The absence of the lesser techniques on this form suggests that passive resistance is not considered to be significant resistance."
• Kinsey said when contemplating whether to write a report, he considered the absence of a case number and file and that the level of force used did not rise to the level required for a salmon sheet.
• Kinsey said he contemplated filing a CYA (cover your a- -) report.
• Kinsey said he asked whether the incident had been recorded on the other officer's squad camera because he wanted to "see how bad it looked," and he "knew that his contact with D1 had been recorded by more than one of the Somalis present."
• Kinsey also said he knew the RPD motto that when in doubt, report, and that he should have alerted the command staff but he "screwed up" and cannot explain what he was thinking.
• If the RPD insists all "hands-on" situations must be reported, "the policy and the salmon sheet should be revised to make this clear."
• "As currently stated and understood by the POs, [Kinsey's] reasoning that the level of force he used did not require a salmon sheet was technically correct."
• "However, in the existing climate of heightened concern about the relationship between law enforcement and communities of color, and the prevalence of incendiary videos arousing community anger, it is not acceptable that [Kinsey] failed to alert the command staff of this incident."
• Kinsey was not intending to cover up the incident because he was aware that he had been recorded, he knew those videos frequently appear on the internet, and it is not convincing that his comments to D2 about Snapchat reflected that Kinsey believed the video had disappeared.
• Kinsey's previous counseling on report writing pertained to his need to be more detailed rather than a failure to report altogether.
The arbitrator concluded:
• Kinsey's use of force was not excessive or unreasonable under the totality of the circumstances.
• Kinsey's failure to report or inform his supervisor of this incident was not intended to conceal it or deceive command staff, which would constitute misconduct, but was a lapse in judgment constituting unacceptable performance that warrants discipline.
*474 The arbitrator ordered that Kinsey be reinstated to his position and made whole less three days of unpaid suspension for his "lapse in judgment" in failing to report the use of force.
The city moved to vacate the arbitration award, arguing that the award was against public policy. The district court denied that motion. This appeal follows.
ISSUE
Does an arbitration award reinstating a police officer who failed to report an incident where he used physical force; admitted he should have reported the incident; and had previously been disciplined, trained, and counseled for failing to adequately report prior instances of force violate a clear public policy, requiring vacation of the award?
ANALYSIS
The city argues that while arbitration awards are generally to be upheld on appeal, a public policy exception applies, which requires that this court vacate the award. Questions of public policy are for the courts to resolve, so we need not give deference to the district court's conclusion that the award does not violate public policy. City of Brooklyn Center v. Law Enf't Labor Servs., Inc. , 635 N.W.2d 236, 241 (Minn. App. 2001), review denied (Minn. Dec. 11, 2001). "Arbitration is a proceeding favored in the law." Id . Generally, absent an agreement limiting an arbitrator's authority, the arbitrator
is the final judge of both law and fact, including the interpretation of the terms of any contract, and his award will not be reviewed or set aside for mistake of either law or fact in the absence of fraud, mistake in applying his own theory, misconduct, or other disregard of duty.
State, Office of State Auditor v. Minn. Ass'n of Prof'l Emps. , 504 N.W.2d 751, 754 (Minn. 1993) (quotation omitted). "Every reasonable presumption must be exercised in favor of the finality and validity of the arbitration award, and courts will not overturn an award merely because they disagree with the arbitrator's decision on the merits." Id. at 754-55 (citations omitted).
However, like all contracts, "a court may not enforce a collective-bargaining agreement that is contrary to public policy." W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers , 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Thus, by treating an arbitration award as if the agreement calls for it, Minnesota courts have recognized a narrow public-policy exception, which may warrant vacation of an arbitration award. Brooklyn Center , 635 N.W.2d at 241-42. For this exception to apply, there must be a well-defined and dominant public policy that is "to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." W.R. Grace , 461 U.S. at 766, 103 S.Ct. at 2183. The relevant inquiry is not whether Kinsey's conduct violated such a public policy, but whether reinstating Kinsey as a police officer at the RPD would violate such a public policy. See State Auditor , 504 N.W.2d at 756 (stating that a terminated employee's conduct may violate a well-defined and dominant public policy, but the arbitrator's award does not automatically also violate that public policy).
It is undisputed that in Minnesota, there is a well-defined and dominant public policy against *475 police officers using excessive force. See City of Minneapolis v. Police Officers' Fed'n of Minneapolis , 566 N.W.2d 83, 89 (Minn. App. 1997) (stating that it is "axiomatic that there is a well-defined and dominant public policy against police officers using excessive force"). Here, the arbitrator found that Kinsey's use of force was not excessive. The city does not challenge that finding. Instead, the city argues that an arbitration award reinstating an officer who failed to report his use of force-after he had been trained, retrained, counseled, and disciplined on this topic-violates public policy. We agree.
To prohibit excessive force on the part of police officers, police departments must be able to monitor occasions when police officers use force. To allow police departments to monitor occasions when police officers use force, police officers must comply with their departments' use-of-force reporting requirements. At the hearing on the motion to vacate the arbitration award, the union agreed with the city's contention that "there is a well-defined public policy in favor of transparency and proper reporting" on the part of police officers. To establish that this public policy is grounded in law and legal precedent, the city cites to the Minnesota Public Employment Labor Relations Act (PELRA), the Minnesota Board of Peace Officer Standards and Training (POST) standards, and Minn. Stat. § 626.8452 (2016).
PELRA establishes a public policy for labor relations in Minnesota. PELRA promotes "orderly and constructive relationships between all public employers and their employees," but it expressly subordinates the rights of the parties to an arbitration proceeding to the rights of Minnesota citizens. Minn. Stat. § 179A.01 (2016). PELRA states, "This policy is subject to the paramount right of the citizens of this state to keep inviolate the guarantees for their health, education, safety, and welfare." Id . We agree that Kinsey's repeated failure to report his use of force makes him a serious risk to public safety and the interest of the public must be given precedence over the arbitration award reinstating him.
The city also cites the POST standards. In Minnesota, the POST Board licenses all police officers and is legislatively required to establish and maintain certain standards of conduct for police officers. See Minn. Stat. § 626.843 (2016) (outlining the rules that the board must adopt).
The [POST] board believes that in order for the public to have confidence in the integrity and ability of law enforcement, it is paramount that peace officers demonstrate that they are capable of self-regulation . The board further believes that internal discipline is properly a function of the appointing authority and its political subdivision.
Minn. R. 6700.1500, subp. 3 (2015) (emphasis added). We agree that Kinsey's repeated failure to report his use of force shows that he is unable to self-regulate in the manner that the POST standards require; thus, reinstating Kinsey conflicts with the public policy that the POST standards establish.
Finally, the city cites Minn. Stat. § 626.8452, which requires that police chiefs establish and enforce written policies governing how police officers use force in their departments. Pursuant to this statute, each chief has a duty to establish and enforce a written use-of-force policy for its police officers. Minn. Stat. § 626.8452. Consequently, Richfield police officers have a duty to abide by those reporting requirements. The city argues that reinstating Kinsey-an officer who has been counseled, disciplined, trained, and retrained on report writing in use-of-force situations-undermines the chief's duty to enforce the RPD's use-of-force policy. We agree.
The union relies on State Auditor , 504 N.W.2d at 754, and City of Minneapolis , 566 N.W.2d at 89-90, to argue that just *476 because a police officer's conduct violates public policy does not mean that an arbitration award reinstating that police officer automatically violates public policy. As previously stated, the relevant inquiry is not whether the police officer's conduct violates a well-defined and established public policy, but whether the arbitration award reinstating the police officer violates public policy. The union also cites two unpublished, nonprecedential decisions from this court to argue that Brooklyn Center , the case the city relies upon, is an outlier. See Law Enf't Labor Servs., Inc. v. Blaine Police Dept. , No. A15-0277, 2015 WL 4715601 (Minn. App. Aug. 10, 2015) (holding there was no violation of well-defined and dominant public policy in enforcing an arbitration award upholding discipline of a law-enforcement employee who made false statements on a grievance form because there is no public policy prohibiting discipline based on statements in a grievance); see also In re Simon , No. A06-475, 2007 WL 823854 (Minn. App. Mar. 20, 2007) (holding that there is no violation of well-defined and dominant public policy in enforcing an arbitration award regarding ownership interests in dissolved corporation because there were no factual findings that respondent engaged in fraud or breached his fiduciary duty). Both of these cases are clearly distinguishable.
We believe this case is more like Brooklyn Center , 635 N.W.2d 236. In that case we vacated an arbitration award that reinstated a police officer who established a long-standing pattern of sexual harassment. We held that "to allow [the police officer] to continue to work as a police officer for Brooklyn Center is tantamount to exempting the city from its duty to enforce its own policy and the public policy against sexual harassment." Brooklyn Center , 635 N.W.2d at 244.[3]
The union concedes that Kinsey should have filed a report after his encounter with D1 on October 3, 2015. Kinsey also acknowledged that he "screwed up" by failing to report the incident and "can't explain the disconnect in his thinking." The city argues that this failure is only the most recent in a series of inadequacies concerning Kinsey's use-of-force reporting. Since August of 2011, Kinsey has been "counseled" four times on the topic. In January 2013, Kinsey received a "documented oral reprimand" for "overly excessive strikes to the head and lack of details in his report to justify his actions." As the district court noted, Kinsey "had seven incidents of coaching, counseling, and training or discipline since 2011, all related to issues with use of force and report writing," and "in 2013, [ ] Kinsey went through 80 hours of intensive remedial re-training focused specifically on use of force and report writing." Despite the RPD's efforts to correct Kinsey's use-of-force reporting, after Kinsey's recent encounter with D1, Kinsey again failed to file a report on his use of force.
The arbitrator considered these facts, but concluded that "counseling is not a disciplinary action and should not be considered as a factor in progressive discipline." The arbitrator also concluded that Kinsey's documented oral reprimand, which was a disciplinary action, was irrelevant to the October 3, 2015 incident because Kinsey's treatment of D1 did not involve the use excessive force. Because the arbitrator found that Kinsey did not use excessive force, Kinsey's prior counseling and discipline may have been irrelevant to whether Kinsey should have been *477 disciplined for excessive force. However, they are relevant to whether Kinsey has engaged in a pattern of inadequate reporting on the use of force. The RPD does not exclusively require its police officers to report their use of excessive force. Whether force was excessive or not can only be determined after the RPD reviews the incident. Indeed, there is no way for the RPD to assess whether force was excessive if the use of force goes unreported. Thus, whether Kinsey's most recent failure to report is part of a pattern of inadequate reporting is central to our review. As this court held in Brooklyn Center , "where there have been prior offenses and warnings, the public-policy exception may be invoked. But when there have been no prior offenses or warnings, the exception may not be invoked." Id. at 243.
Reinstating Kinsey-an officer who admittedly failed to report his use of force when he should have and has had prior offenses and warnings regarding the same duty to report-interferes with the RPD's legal obligation to establish and enforce minimum standards of conduct for its police officers. Specifically, it interferes with the clear public policy in favor of police officers demonstrating self-regulation by being transparent and properly reporting their use of force. Further, the arbitration award interferes with the public policy against police officers using excessive force because the only way a city and police department can successfully uphold that public policy is if they are given the opportunity to review occasions involving the use of force.
We are aware that our decision today is only the second time this court has vacated an arbitration award involving the reinstatement of a Minnesota Police Officer because of a violation of public policy. See Brooklyn Center , 635 N.W.2d 236 (applying the public-policy exception to vacate an arbitration award that reinstated a Minnesota Police Officer for the first time). We do not take this action lightly, but rather thoughtfully and unanimously. Nevertheless, we are obligated to follow the law. To do otherwise would violate a well-defined and dominant public policy by jeopardizing public safety and undermining public trust in law enforcement.
DECISION
The district court erred in declining to vacate the arbitrator's award.
Reversed.

Kinsey testified that he was responding to group members indicating they were going to engage with Kinsey, and the arbitrator found this was supported by D1's report to the media that "his friends then approached the officer."

Police departments assign case numbers to specific incidents so they can organize and file reports associated with those incidents in their records systems.

In Brooklyn Center , we cited in part to POST Board rules as evidence of a well-defined and dominant public policy. Id. at 242.